COALITION OF NEW JERSEY SPORTSMEN, INC., Bob's Little Sportshop, Inc., Springfield Inc., Armalite, Inc., Robert L. Viden, Jr., Stephen D. McClure, John Does I, II, III, IV, V, VI, VII, VIII, and IX, Plaintiffs,

v.

Christine Todd WHITMAN, Governor, State of New Jersey, Peter Verniero, Attorney General, State of New Jersey, Harris Y. Cotton, Prosecutor of Gloucester County, New Jersey, Patricia Kunchynski, Chief of Glassboro, NJ, Police Department, Carl A. Williams, Colonel, Division of New Jersey State Police, Defendants.

No. Civ.A. 96–3037(JHR).

United States District Court, D. New Jersey.

March 31, 1999.

---

Gary Jay Needleman, Needleman & Schocket, Montville, NJ, for plaintiffs.

Michael John Williams, Deputy Attorney General, Office of New Jersey Attorney General, Divison of Criminal Justice–Appellate Section, Trenton, NJ, for defendants Whitman, Poritz, Williams.

Bruce C. Hasbrouck, Dianne Herland Sloane, Hasbrouck & Uliase, Woodbury, NJ, for defendant Cotton.

Timothy Scaffidi, Ragonese, Scaffidi & Albano, Woodbury, NJ, for defendant Kunchynski.

## OPINION

RODRIGUEZ, District Judge.

Plaintiffs, the Coalition of New Jersey Sportsmen, Inc., Bob's Little Sportshop, Inc., Springfield, Inc., ArmaLite, Inc., Robert L. Viden, Jr., Stephen D. McClure, and nine other New Jersey residents identified simply as John Does I through IX (collectively "plaintiffs"), bring this action for declaratory judgment and injunctive relief against the Governor of New Jersey, the state's Attorney General[1], Colonel Carl A. Williams of the New Jersey State Police, the Prosecutor of Gloucester County as prosecutor, and the Chief of Police of the Glassboro Police Department in New Jersey ("collectively Defendants")[2]. At issue is New Jersey's assault weapons law, passed and signed into law in 1991, and now codified at N.J.S.A. 2C:39–1 et seq.

Plaintiffs raise the following federal constitutional challenges to this state law: (1) it is unconstitutionally vague, and thus void (Counts III, V, VIII, X, XI, and XIV); (2) it violates equal protection (Counts I, II, IV, VI, IX, XII, and XIII); (3) it violates their rights to free association (Count I); (4) it infringes on their right to free speech (Count IV); and (5) it constitutes a bill of attainder (Count VII). The complaint also seeks a declaratory judgment that certain firearms are not "assault firearms" within the meaning of the statute, and that plaintiffs who register their weapons and possess "large capacity ammunition magazines" are not required under N.J.S.A. 2C:39–3j to actually participate in competitive shooting matches sanctioned by the Director of Civilian Marksmanship.

This matter is now before the court on motions for summary judgment filed by both plaintiffs and defendants. For the reasons set forth below, plaintiffs' motion for summary judgment is denied, and defendants' motion is granted.

## FACTUAL BACKGROUND

On May 17, 1990, the New Jersey Legislature passed a bill restricting the possession, sale, and transport of "assault firearms" and "large capacity ammunition magazines." L.1990, c. 32. Governor James Florio signed the bill into law on May 30, 1990, N.J.S.A. 2C:39–1 et seq. (the "Act"), saying at the time, "[t]hese are weapons of war designed to kill as many people as possible in the least amount of time. They have no place on our streets, where too often our police find themselves outgunned." N.J. Lawmakers Approve Nation's Toughest Ban on Assault Weapons, L.A. TIMES, May 18, 1990, at 4.

Beyond the obvious objective of removing assault weapons from New Jersey streets and from the hands of criminals, the rationale for this law can also be found in then Attorney General Robert Del Tufo's testimony concerning Senate Bill 166. Testifying before the Senate Judiciary Committee on March 12, 1990, the Attorney General explained that the intent of the law did not touch upon any firearms used for legitimate hunting or target

1. Although Deborah T. Poritz, former New Jersey Attorney General, was originally named as a defendant, pursuant to Fed. R.Civ.P. 25(d)(1), Peter Verniero is automatically substituted in her place.

2. The last two defendants responded to the complaint's allegations by writing, "[f]iles no response as has no independent information, knowledge or belief of the truth of the allegations or statements made so is incapable or admitting or denying." (See Answers of 7/25/97 & 8/7/97).

shooting purposes. Rather, the law would only prohibit semi-automatic (ie. self-loading) shotguns with excessive magazine capacities, or with other prohibited characteristics such as a pistol grip designed for hand-held firing. According to this testimony, "[a]ny person who possesses a shotgun with a magazine capacity of more than 5 rounds intends to hunt something other than game." (Plaintiffs' Exh. 18, Del Tufo Testimony).[3]

New Jersey's gun control statute accomplishes its prohibition by defining the term "assault firearm" to include five separate categories of firearms: (1) certain firearms listed by make and model, series or type; (2) "[a]ny firearm manufactured under any designation which is substantially identical to any of the firearms listed above"; (3) a semi-automatic[4] shotgun with either a magazine capacity exceeding six rounds, a pistol grip[5], or a folding stock; (4) a semi-automatic rifle with a fixed magazine capacity exceeding 15 rounds; and (5) "a part or combination of parts designed or intended to convert a firearm into an assault firearm, or any combination of parts from which an assault firearm may be readily assembled if those parts are in the possession or under the control of the same person." N.J.S.A. 2C:39–1w(1–5).

Under the statute, "any person who knowingly has in his possession" such a firearm is guilty of a third degree crime[6], unless certain very narrow exceptions apply. N.J.S.A. 2C:39–5(f). Possession of large capacity ammunition magazines[7] is also prohibited, subject to some of the same exceptions. N.J.S.A. 2C:39–3(j). Exceptions to the general prohibition include if a weapon is among the types certified by the Attorney General as a 'legitimate' target-shooting firearm and the owner has registered the weapon with the state and proven his or her membership in a valid rifle or pistol club, see N.J.S.A. 2C:58–12, or if the weapon has been rendered permanently inoperable, see N.J.S.A 2C:58–5, 13. There are also exemptions within the law for certain government employees, such as member of the Armed Forces and federal law enforcement officials. N.J.S.A. 2C:39–6. A one-year grace period was provided for individuals who currently owned prohibited weapons to comply with the law or surrender the firearm. N.J.S.A. 2C:58–13. There was no grandfather clause for those individuals who legally possessed assault weapons at the time this law was enacted.

The law's prohibitions extend beyond merely possessing such weapons; the challenged law also provides that "[a]ny person who manufactures, causes to be manufactured, transports, ships, sells or disposes of an assault firearm without being registered or licensed to do so pursuant to N.J.S.A. 2C:58–1 et seq. is guilty of a crime of the third degree." N.J.S.A. 2C:39–9g.

The law also touches upon the civil liability of individuals who legally possess assault weapons that are later used in the commission of a crime. Under N.J.S.A. 2C:58–5(h), if a registered assault firearm is used in a crime, "the holder of the

---

**3.** Although the law that ultimately passed differed as to definitions from the Senate bill upon which the Attorney General was testifying, the rationale of the prohibitions cannot be said to differ between the two.

**4.** "Semi-automatic" means a firearm which fires a single projectile for each single pull of the trigger and is self-reloading or automatically chambers a round, cartridge, or bullet. N.J.S.A. 2C:39–1(x).

**5.** "Pistol grip" means a well-defined handle, similar to that found on a handgun, that protrudes conspicuously beneath the action of the weapon, and which permits the shotgun to be held and fired with one hand. N.J.S.A. 2C:39–1(z).

**6.** Third degree crime convictions carry with them a sentence of imprisonment of between three and five years. N.J.S.A. 2C:43–6a(3).

**7.** "Large capacity ammunition magazine" means a box, drum, tube or other container which is capable of holding more than 15 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm. N.J.S.A. 2C:39–1(y)

license for that assault firearm shall be civilly liable for any damages resulting from that crime." An exemption from liability applies if the weapon was stolen and reported within 24 hours of discovering such theft. N.J.S.A. 2C:58–5(h). Presumably this provision in the law discourages individuals from owning assault firearms, or it at least encourages quick reporting of theft.

The gravamen of plaintiffs' complaint can be found in their brief in the following paragraph:

> Plaintiffs cannot determine whether they possess "assault firearms" or "large capacity ammunition magazines" because those terms are vague. They are threatened with prosecution if they possess firearms and magazines in New Jersey, and incur costs and are deprived of their use when stored outside of New Jersey. Plaintiffs who were not members of a club could not register assault firearms the Attorney General labeled "legitimate." Plaintiffs ArmaLite, Springfield, and Bob's Little Sportshop have lost profits because they cannot market numerous firearms in New Jersey.

(Plaintiffs' Br., 7/24/98, at 3).

Based on these and other allegations, plaintiffs filed suit on June 28, 1996, asserting as grounds for the action 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. §§ 1983 and 1988, and the United States Constitution. Defendants first filed a pre-Answer motion urging this court to abstain from deciding state law questions under the doctrine of *Pullman* abstention. In the alternative, defendants sought dismissal or summary judgment. Plaintiffs responded by filing a cross-motion to stay defendants' motion for summary judgment.

In an Order entered on June 24, 1997, this court denied defendants' motion for abstention, finding instead that defendants demonstrated only one of three circumstances which might have counseled for *Pullman* abstention. *See* Order dated June 24, 1997. The court also denied defendants' motion to dismiss or for summary judgment, and accordingly held that plaintiffs' motion to stay summary judgment was moot. After further discovery ensued, both sides filed these motions for summary judgment. This court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

## STANDARD OF REVIEW

The entry of summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about it might affect the outcome of the suit. *Id.* In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its opening burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. The non-moving party may not rest upon the mere allegations or denials of its pleading. *Id.; Maidenbaum v. Bally's Park Place, Inc.*, 870 F.Supp. 1254, 1258 (D.N.J.1994). "[T]he plain language of Rule 56(c) mandates the

entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

However, in deciding the motion, the court does not "weigh the evidence and determine the truth of the matter, but [instead] determine[s] whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. If the non-movant has provided evidence exceeding the "mere scintilla" threshold in demonstrating a genuine issue of material fact, the court cannot weigh the evidence and credit the movant's interpretation of the evidence. This is so even if the movant's evidence far outweighs the non-movant's evidence. Credibility determinations are the province of the factfinder. *Big Apple v. BMW of North America,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

## DISCUSSION

### A. JURISDICTIONAL ISSUES

■ Defendants first contend that the Eleventh Amendment and abstention doctrines [8] requires this court to stay this action to permit state court resolution of disputed interpretations of this assault weapons ban. In particular, defendants allege that there are at least 17 different

issues of state law, the resolution of which would obviate or at least impact the federal analyses necessary under this federal constitutional challenge to this New Jersey law.[9] According to the defendants, plaintiffs seek from this court 'binding' constructions on matters of state law. This, according to the defendants, is prohibited by the Eleventh Amendment as construed by the Supreme Court in *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (*"Pennhurst II"*).

In *Pennhurst II,* the Supreme Court held that the Eleventh Amendment bars federal injunctive relief against a state official if (1) " 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be to 'restrain the Government from acting, or to compel it to act,' " 465 U.S. at 101 n. 11, 104 S.Ct. at 908 n. 11 (*quoting Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963)), and if (2) the conduct to be restrained is within the scope of authority delegated to the official by state law, see *id.* 465 U.S. at 102, 104 S.Ct. at 909. The suit in *Pennhurst II* was barred because it involved a pendent claim against state agencies and officers seeking prospective injunctive relief for a violation of state law:

In such a case the entire basis for the doctrine of *Young* and *Edelman* disappears. A federal court's grant of relief against state officials on the basis of

---

**8.** Defendants revisit the *Pullman* abstention issue which this court decided against them in the previous Order issued in this case. Defendants now claim that "the defense of sovereign immunity corrects the two *Pullman* deficiencies that this Court found in defendants' earlier motion." (Defendants' Br. p. 8). In other words, defendants argue that "this Court no longer has discretion" because unlike the normal *Pullman* context "the Eleventh Amendment and the Pennhurst doctrine are alternative bases for *Pullman* abstention...." (*Id.* at 13).

**9.** These 17 state-law issues are listed in ¶ 43 of Defendants' Statement of Material Facts, submitted in accordance with Local Civil Rule 56.1. In general, these statements note the defendants' and plaintiffs' contrasting interpretations of different portions of the statute, and then individual paragraphs conclude with the following or very similar boilerplate language: "If defendants [or plaintiffs] are correct, their state-law construction will substantially narrow plaintiffs' federal claim that the alleged absence of this requirement is unconstitutionally irrational and violative of plaintiffs' rights...." (Defendants' Material Facts, ¶ 43(A)).

state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

*Id.* at 106, 104 S.Ct. at 911.

Defendants seek to characterize plaintiffs' causes of action as arising under state law. This characterization is designed presumably to strengthen the case for abstention based on the presentation of a *Pennhurst II*-type action. Nonetheless, this clearly is a mischaracterization of this action.

Every count of plaintiffs' complaint alleges violations under the United States Constitution, actionable under 42 U.S.C. § 1983. Federal jurisdiction over this claim was based on the existence of a federal question, not, as in *Pennhurst II*, on principles of pendent jurisdiction. While the resolution of these constitutional issues necessarily requires this court to ascertain what state law means, this is a far cry from a prohibited *Pennhurst II*-type action which seeks injunctive relief on the basis of state law. The Third Circuit was presented with, and soundly rejected, a similar argument in the case of *Everett v. Schramm*, where the Court instructed as follows:

Though it is true that [deciding the case] required the district court to ascertain what the standard of need was under Delaware law, ascertaining state law is a far cry from compelling state officials to comply with it. The ascertainment of state law is an everyday function of the federal court, in cases ranging from those falling within our diversity or pendent jurisdiction, to those brought under section 1983 which claim deprivation of a state-created property right. Indeed, section 1983 would be rendered almost nugatory if federal courts are prohibited, by the eleventh amendment, from deciding matters of state law in cases brought against state officials.

772 F.2d 1114, 1119 (3d. Cir.1985); *see also Piecknick v. Commonwealth of Pennsylvania*, 36 F.3d 1250, 1255 n. 7 (3d. Cir.1994) ("*Pennhurst II* did not address the Eleventh Amendment's bar of suits against state officials in federal court when the claims are based on deprivation of federal constitutional or statutory rights."); *Barnes v. Cohen*, 749 F.2d 1009, 1018 (3d. Cir.1984).

Nothing in the *Pennhurst II* case and its interpretation of the Eleventh Amendment causes this court to rethink its Order not to stay this action pending state court resolution of related issues. Accordingly, this court will proceed to decide whether or not portions of the disputed statute violate the Federal Constitution.[10]

---

**10.** Defendants have not challenged any of the plaintiffs' standing to bring this case, or the ripeness of this action. Of course, Article III, section 2 of the Constitution limits federal jurisdiction to actual "cases" and "controversies," U.S. Const.Art. III, § 2, and since this is a jurisdictional requirement, it cannot be waived. To have standing, a litigant must have suffered an injury-in-fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed with the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Organizations can also have standing if they satisfy three requirements. *See Hunt v. Washington State Apple Adver. Comm'n*, 432

U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Although the relief sought here is pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a),

[t]he difference between an abstract question and a "controversy" ... is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

## B. VAGUENESS

Plaintiffs primary allegation is that several aspects of the assault firearms ban are unconstitutionally vague and thus should be struck down by this court. Specifically, in Count III of the complaint the term "assault firearm" and components of its definition [11] are attacked as both facially vague and vague as applied to particular plaintiffs. (Compl.¶¶ 48–81). Count V seeks a declaration that ten specific weapons, produced by either the plaintiffs Springfield or ArmaLite, are not "assault firearms," or, in the alternative, that the definition of "assault firearms" is vague as applied to such rifles. (Compl.¶¶ 90–96). Count VIII attacks the definition of "large capacity ammunition magazine," by opining that "as applied to tubular magazines which may be loaded with different amounts of rounds of ammunition depending on cartridge length, this definition is vague." (Compl.¶ 111). Count X alleges that the act's prohibition on the possession of large capacity ammunition magazines unless "maintained and used in connection with participation in competitive shooting matches . . ." is vague because there are

*Armstrong World Indus., Inc. v. Adams,* 961 F.2d 405, 410 (3d Cir.1992) (*quoting Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)).

Because of the timing of when a declaratory judgment is sought, that is, before an injury is necessarily established, there is an inherent tension between declaratory judgments and the concept of ripeness, which is another prerequisite of Article III jurisdiction. *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio,* 40 F.3d 1454, 1463 (3d Cir.1994) (noting that ripeness is properly understood as involving a question of when a party may seek pre-enforcement review of a statute or regulation) (citation omitted). To discern the ripeness of declaratory judgment actions the Third Circuit has held that a court should look to the following three factors, among others: (1) the adversity of interest between the parties; (2) the conclusiveness of a judicial judgment; and (3) the practical help, or utility, of a judgment. *Pic–A–State Pa. Inc. v. Reno,* 76 F.3d 1294, 1298 (3d. Cir.1996).

While the court felt it necessary to address these jurisdictional prerequisites, the court concludes that the plaintiffs have standing and that the present controversy is ripe for review. The weapons manufacturers and sellers which challenge the law are clearly economically affected by the law already. *See National Rifle Ass'n of America v. Magaw,* 132 F.3d 272, 280–84. The individually named plaintiffs also have standing because each is a weapons owner who wishes to engage in, or already is engaging in, conduct prohibited under the statute. Such individuals are in a bind with the assault weapons they now own; they can either illegally possess such weapons in New Jersey, or store them outside the state at financial costs and the loss of their use. Their membership in the organization, as well as the interests which are germane to it are sufficient for standing purposes. Moreover, on the face of the complaint, defendants' answer, and additional affidavits submitted, it is clear to this court that the alleged future harm is "real and substantial," or of "sufficient immediacy and reality." *Presbytery,* 40 F.3d at 1463; *Armstrong,* 961 F.2d at 412. While the named plaintiffs may not have been prosecuted yet for any violations under the statute, and indeed they may never be, the defendants insist that the disputed statute is and will continue to be enforced. *See Presbytery,* 40 F.3d 1454, 1463–68 (3d Cir.1994) (failure of state to disavow intent to prosecute sufficient to create adversity between the parties). Furthermore, this case involves primarily legal questions, where the need for 'concrete' facts necessary to the conclusiveness inquiry is not as strong as often required to make a controversy ripe. Predominately legal controversies include whether a state or federal statute is constitutional on its face. *Pic–A–State,* 76 F.3d at 1300 (citations omitted). Finally, the parties need this decision to clarify their legal relationships such that the parties can "make responsible decisions about the future." *Armstrong,* 961 F.2d at 412 (*citing Step–Saver,* 912 F.2d at 649). This is the case here, where the plaintiffs wish to engage in conduct plainly prohibited on the face of the allegedly unconstitutional statute. *See also Peoples Rights Organization, Inc. v. City of Columbus,* 152 F.3d 522, 528–31 (6th Cir.1998).

11. The plaintiffs allege that the terms 'type,' 'series,' 'substantially identical,' and 'combination of parts,' all of which illuminate what is and is not a prohibited 'assault firearm,' are vague. Furthermore, they take issue with the act's definition (and its component parts) of particular prohibited shotguns, which are prohibited if one is "a semi-automatic shotgun with either a magazine capacity exceeding six rounds, a pistol grip, or a folding stock." N.J.S.A. 2C:39–1w(3).

not standards as to how often one must compete, or what actually qualifies as competition, and because the agency which sanctions qualifying shooting matches no longer exists in the same organizational framework as specified in the Act. (Compl.¶¶ 119–124). Similarly, plaintiffs seek in Count XI a declaration that weapons previously registered pursuant to the shooting competition exception need not be surrendered if no longer used in competition, or, in the alternative, that this aspect of the law is vague. (Compl.¶¶ 126–127). Finally, in Count XIV, plaintiffs allege that the term 'inoperable' is vague as applied to the unique circumstances of two plaintiffs, who claim to legally possess (under an exception) an assault firearm, as well as other assault firearms which they have rendered 'inoperable.' These plaintiffs question whether they violate the law because they are in 'possession' of weapon components [12] (on the legally-owned weapons) which conceivably could be used to render the inoperable weapons operable. (Compl.¶¶ 135–140).

The Due Process Clause of the Fourteenth Amendment to the United States Constitution, upon which the plaintiffs rely for this vagueness challenge, can render a statute unconstitutional based on notions of fairness. *Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972). Vague laws offend the assumption that "man is free to steer between lawful and unlawful conduct," and thus "we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972); *see also Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so

vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."); *Bradley v. Pittsburgh Bd. of Educ.,* 910 F.2d 1172, 1177 (3d Cir.1990). A second justification for vagueness challenges also exists: to prevent arbitrary and discriminatory enforcement. "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications" *Grayned,* 408 U.S. at 108–109, 92 S.Ct. at 2298; *Kolender v. Lawson,* 461 U.S. 352, 358, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983).

In the criminal context, vagueness attacks are based on lack of notice, and "they may be overcome in any specific case where reasonable persons would know their conduct puts [them] at risk" of punishment under the statute. *Maynard v. Cartwright,* 486 U.S. 356, 361, 108 S.Ct. 1853, 1857, 100 L.Ed.2d 372 (1988). Thus, to be constitutional, criminal statutes need only give "fair warning" that certain conduct is prohibited, *Colten,* 407 U.S. at 110, 92 S.Ct. at 1957, and statutes meet this constitutional standard if the language employed conveys a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. *United States v. Wise,* 550 F.2d 1180, 1186 (9th Cir.), *cert. denied,* 434 U.S. 929, 98 S.Ct. 416, 54 L.Ed.2d 290 (1977). The mere fact that a statute could have been written more precisely does not mean the statute as written is unconstitutionally vague. *United States v. Powell,* 423 U.S. 87, 94, 96 S.Ct. 316, 321, 46 L.Ed.2d 228 (1975).

1. Facial Vagueness [13]

An initial determination must be made as to whether or not the disputed law

---

12. Under N.J.S.A. 2C:58–13.c, " 'inoperable' means that the firearm is altered in such a manner that it cannot be immediately fired and that the owner or possessor of the firearm *does not possess or have control over* the

parts necessary to make the firearm operable." (emphasis added).

13. A "facial" challenge means a claim that the law is "invalid in toto—and therefore in-

touches upon significant constitutionally protected conduct. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494–95, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). The import of this inquiry is to discern the level of scrutiny to which this law should be subjected on this facial vagueness challenge. Although the complaint seeks to invalidate portions of the law which require membership in gun clubs based on the First Amendment's freedom of association, the void for vagueness arguments center on multiple phrases in the law which do not implicate constitutionally protected conduct. In other words, the alleged vagueness of the law is attacked in a pre-enforcement review action based on due process, not, as in many cases, the First Amendment, which would heighten judicial scrutiny.

■ Accordingly, the facial vagueness challenge can succeed "only if [plaintiffs] demonstrate that the law is impermissibly vague in all of its applications." *Hoffman Estates,* 455 U.S. at 495, 497, 102 S.Ct. at 1191–92, 1193. So long as the disputed law encompasses some of the 'core' con-

duct in which plaintiffs wish to engage, a court will not entertain a facial vagueness challenge to other hypothetical conduct. *Id. See also Richmond Boro Gun Club, Inc. v. City of New York,* 97 F.3d 681, 684 (2d. Cir.1996) ("Plaintiffs could perhaps succeed on a facial vagueness challenge if they could show that the law is impermissibly vague 'in all of its applications.' ") (*quoting Hoffman Estates*).[14] Courts will rarely invalidate a statute on its face so long as it provides "minimally fair notice" of what is prohibited. *See* Rotunda & Nowak, Treatise on Constitutional Law: Substance and Procedure, 2nd § 17.8 n. 22.

### (a) The Defining of 'Assault Firearms'

■ Plaintiffs first challenge how the statute defines prohibited assault firearms. The Act prohibits the possession, sale or transport of 'assault firearms,' and weapons come within the purview of this statute in one of four ways. The first way in which weapons are defined as 'assault firearms is by reference to a specific list of prohibited weapons,[15] which plaintiffs chal-

capable of any valid application." *Steffel v. Thompson,* 415 U.S. 452, 474, 94 S.Ct. 1209, 1223, 39 L.Ed.2d 505 (1974).

**14.** This court is aware that Supreme Court jurisprudence has described the doctrine of vagueness and the standards used to evaluate it in varying terms. In *Hoffman Estates,* for example, the Supreme Court upheld a facial challenge to a law which regulated businesses that sold any items that were "designed or marketed for use with illegal cannabis or drugs." 455 U.S. at 491–92, 102 S.Ct. at 1189–90. Just one year later, in *Kolender v. Lawson,* the Supreme Court struck down a facial challenge to a California statute which required individuals to provide "credible and reliable" identification information when stopped by a peace officer in a *Terry*-type detention. 461 U.S. 352, 355, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). The differing standards that seemed to apply in these two cases, decided roughly 1 year apart, can be reconciled by the type of conduct and penalty which each of the challenged statutes prohibited. In *Hoffman Estates,* the statute was akin to economic (as opposed to constitutional) regulations, and only quasi-criminal, thus

scrutiny was less exacting. 455 U.S. at 494–95, 102 S.Ct. at 1191. In *Kolender,* the statute at issue was criminal in nature, and it provided police officers unfettered discretion to stop individuals. Thus, the law implicated First Amendment and freedom of movement concerns, and consequently it was scrutinized more closely. 461 U.S. at 358 n. 8, 103 S.Ct. at 1859 n. 8. *See also Chapman v. United States,* 500 U.S. 453, 467, 111 S.Ct. 1919, 1929, 114 L.Ed.2d 524 (1991) ("[V]agueness claim must be evaluated as the statute is applied to the facts of [the] case" when "First Amendment freedoms are not infringed by the statute.").

**15.** Under the statute, "Assault firearm" includes the following firearms:

Algimec AGM1 type
Any shotgun with a revolving cylinder such as the "Street Sweeper" or "Striker 12"
Armalite AR–180 type
Australian Automatic Arms SAR
Avtomat Kalashnikov type semi-automatic firearms
Beretta AR–70 and BM59 semi-automatic firearms

lenge on vagueness grounds. According to the plaintiffs, firearm owners do not have notice of what weapons are actually prohibited, because the lists do not correspond exactly to the manufacturer and model specifications actually engraved on the firearms, pursuant to 18 U.S.C. § 923(I) and 27 C.F.R. § 178.92. (Plaintiffs' Exh. 1, Johnson Aff., ¶ 11). Further, several models specified in the statute allegedly do not even exist, or are named in an "inaccurate, oxymoronic, or otherwise vague manner." (*Id.*) [16]

One egregious example of these misnomers is the prohibition on 'Avtomat Kalashnikov type semi-automatic firearms' because, according to the plaintiffs' expert, this listing is not engraved on any existing firearm. Moreover, "[n]umerous semiautomatic rifles have been imported with a cosmetic appearance similar to the above rifle but with redesigned, [Bureau of Alcohol, Tobacco and Firearms]—approved receiver and internal parts, and with markings such as 'AKS' or 'AK–47S'. Other rifles have been imported with a receiver outwardly similar to the above rifle but internal parts redesigned, and with other parts dissimilar to it." (Plaintiffs' Exh. 1, Johnson Aff. ¶¶ 17–18). Confusion arises, according to this expert, because "[n]o expert would ever classify these semiautomatic rifles as 'Avtomat Kalashnikov,' nor would an ordinary person have notice that such rifles are considered to be 'Avtomat Kalashnikov.'" (*Id.*) [17]

Plaintiffs arguments as to the antiquated or erroneous listings of prohibited firearms, and their objections to the use of the words 'type' and 'series,' fails to establish that the listings in the Act are vague in light of the standard which this court applies in a facial vagueness challenge. Even accepting as true all of the expert's testimony concerning the misnomers throughout the listings, his analysis of such listing fatally undermines the facial vagueness challenge. In other words, his testimony, while certainly indicative of confusion in their applications to multiple

Bushmaster Assault Rifle
Calico M–900 Assault carbine and M–900
CETME G3
Chartered Industries of Singapore SR–88 type
Colt AR–15 and CAR–15 series
Daewoo K–1, K–2, Max 1 and Max 2, AR 100 types
Demro TAC–1 carbine type
Encom MP–9 and MP–45 carbine types
FAMAS MAS223 types
FN–FAL, FN–LAR, or FN–FNC type semi-automatic firearms
Franchi SPAS 12 and LAW 12 shotguns
G3SA type
Galil type
Heckler and Koch HK91, HK93, HK94, MP5, PSG–1
Intratec TEC 9 and 22 semi-automatic firearms
M1 carbine type
M14S type
MAC 10, MAC 11, MAC 11–9mm carbine type firearms
PJK M–68 carbine type
Plainfield Machine Company Carbine
Ruger K–Mini–14/5F and Mini–14/5RF
SIG AMT, SIG 550SP, SIG 551SP, SIG PE–57 types
SKS with detachable magazine type
Spectre Auto carbine type
Springfield Armory BM59 and SAR–48 type
Sterling MK–6, MK–7 and SAR types
Steyr A.U.G. semi-automatic firearms
USAS 12 semi-automatic type shotgun
Uzi type semi-automatic firearms
Valmet M62, M71S, M76, or M78 type semi-automatic firearms
Weaver Arm Nighthawk
N.J.S.A. 2C:39–1w(1).

**16.** Closely related to these allegations of confusion are plaintiffs' objections to the terms 'type' and 'series' as used in the specific listings. *See* n. 13 *supra* (listing as a prohibited weapon, for example, the 'ArmaLite AR–180 type'). Plaintiffs' expert claims that the word 'type' is properly applied to only Chinese and/or North Korean firearms, and that Western and Russian firearms are never marked or known as a 'type.' (Plaintiffs' Exh. 1, Johnson Aff., ¶¶ 59–60). The plaintiffs conclude that because the words 'type' and 'series' are not marked on weapons and because weapons are not 'known' as such in the industry, these words render the definitions unconstitutionally vague.

**17.** Plaintiffs also point out similar confusion surrounding 12 other prohibited weapons classifications. (*See* Plaintiffs' Exhs., Johnson Aff., Miller Aff., Viden Aff., Doe III Aff., Doe VIII Aff.)

variations on literally thousands of weapons, also confirms that each listing has a 'core' to its content. At the very least, each listing sufficiently puts on notice a person of ordinary intelligence that a weapon he or she possess, may be prohibited by the terms of the list itself, or at least possibly by the 'substantially identical' prohibition of N.J.S.A. 2C:39–1w(2), considered *infra*.

The example of the 'Avtomat Kalashnikov type semi-automatic firearms' prohibition is demonstrative of each of the challenged listings. Plaintiffs' expert knows, with very few exceptions,[18] that to which each listing refers, at least in very general terms. Likewise, Richard Miller, the Chairman of the Coalition of New Jersey Sportsmen, confirmed that "[e]veryone knows that the 'Avtomat Kalashnikov' is a full automatic machine gun designed by the Russian Michael Kalashnikov." (Plaintiffs' Exh. 2, Miller Aff., ¶ 17). While 'Avtomat Kalashnikov' might not be engraved on any existing weapon, such a listing provides notice to an owner of an 'AK–47S' to at least inquire further. Indeed, the regulation of firearms is hardly new to our society. *See e.g., In re Two Seized Firearms*, 127 N.J. 84, 88, 602 A.2d 728, *cert. denied sub. nom., Sholtis v. New Jersey*, 506 U.S. 823, 113 S.Ct. 75, 121 L.Ed.2d 40 (1992) (*quoting McIntosh v. Washington*, 395 A.2d 744, 756 (D.C.1978)) ("[W]here dangerous or deleterious devices or products are involved, the probability of regulation is so great that anyone who is aware that he is either in possession of or dealing with them must be presumed to be aware of the regulation.")

Similarly, the prohibition on 'Uzi type semi-automatic firearms' has a 'core' to its meaning; Uzi semiautomatic firearms marked Model A and Model B and which were produced at the time of this Act's passage are prohibited. An expert's postulation that a subsequently produced 'Uzi–Eagle' pistol, which is not banned under the Act, renders the original designation vague, ignores the proper analysis applied to this facial challenge. The analysis does not concern whether confusion arises upon the production of similarly-designated weapons. Indeed, the record confirms that the manufacturing of weapons is hardly a static industry, and that weapons manufacturers quickly respond to changes in the law. (*See e.g.,* Defendants' Exh. F, Treasury Study, p. 25) (explaining manufacturer modifications in response to a 1989 federal ban on semiautomatic assault rifles). Rather, the question is whether the statute has at least one valid application.

Nor does the inclusion of the terms 'type' or series' render specific listings vague. In this specific context, these words merely expand upon listings which themselves have a sufficient 'core' for this vagueness challenge. *See Benjamin v. Bailey*, 234 Conn. 455, 485–86, 662 A.2d 1226, 1241–42 (Conn.1995) (because the AK–47 and the MAC weapons are identifiable, "the statutory phrases 'AK–47 type' and 'MAC–10, MAC–11 and MAC–11 Carbine type' are not facially vague). The addition of these words to the 'core' definitions does not eviscerate the 'core;' they simply expand their meanings.[19]

---

**18.** Plaintiffs' expert does not know if the listings for the Australian Automatic Arms SAR, Demro TAC–1 carbine type, G3SA, or PJK M–68 carbine type, actually refer to any existing firearms.

**19.** It is also noteworthy that defendants have brought forth some evidence that the use of the word 'type' is not without precedent. An advertisement for an A2 Semi-auto Rifle Kit describes the unassembled kit as an 'A2 AR–15 type,' which undermines plaintiffs' professed confusion concerning the use of this

phrase. (Defendants Exh. R, Flahive Aff., 7/24/98). The word 'type' is also utilized to delineate the Treasury Secretary's power to authorize the importation of weapons particularly suitable for sporting purposes. (*See e.g.,* Defendants Exh. F, Treasury Study, p. 6). *See also Fresno Rifle and Pistol Club, Inc. v. Van de Kamp*, 746 F.Supp. 1415, 1427 Appendix A (E.D.Cal.1990) (upholding California's assault weapons law which included a listing of specific weapons, such as 'Avtomat Kalashnikovs (AK) series).

The example of the Uzi listing is again instructive. As plaintiffs' expert essentially concedes in his testimony cited *supra*, the confusion concerning what falls within prohibited 'Uzi type semi-automatic firearms' stems from newly manufactured weapons such as the 'Uzi Eagle' pistol. (Plaintiffs' Exh. 1, Johnson Aff., ¶¶ 55–56). Thus, this vagueness challenge essentially alleges that too many weapons come within such a definition due to the phrase 'type,' which then renders the phrase unconstitutionally vague. This ignores the 'core' which is still there. This court declines to read a statute broadly in order to render it unconstitutional. *See United States v. Edmonds*, 80 F.3d 810, 819 (3d. Cir.), *cert. denied*, 519 U.S. 927, 117 S.Ct. 295, 136 L.Ed.2d 214 (1996); *United States v. Navarro*, 145 F.3d 580, 589 (3d. Cir. 1998). Moreover, New Jersey has determined that the example used above, the 'Uzi Eagle' pistol, is not an assault firearm prohibited under state law. (*See* Plaintiffs' Exh. 2, Letter from Eugene Lewis, dated 1/8/98). This was in response to an inquiry from one of the plaintiffs in this case. Thus, put on notice that an Uzi weapon may be prohibited, this particular plaintiff submitted an inquiry and determined that the weapon was not so prohibited. This belies the notion that the term 'type' lacks any 'core' to at least put citizens on notice of their possible prohibition.

Plaintiffs also attack the phrase 'substantially identical,' contained in N.J.S.A. 2C:39–1w(2), which expands the definition of 'assault firearm' to include a weapon "manufactured under any designation which is substantially identical to any of the firearms listed above." Plaintiffs provide a host of examples demonstrating the confusion surrounding this phrase. For example, John Doe IX owned a Charter Arms AR7 rifle, which the State Police opined was not an assault firearm. Then, in 1994, the same State Police charged him with possession of two assault firearms, one of which was the AR7 rifle. These charges were disposed of through PTI. (Plaintiffs' Exh. 15, Doe IX Aff., ¶¶ 3–4).

Other examples are also provided, which tend to show an inconsistent application of the law based on the confusing 'substantially identical' standard used to define what is prohibited. (*See* Plaintiffs' Exh. 12, Doe VI Aff., Exh. 3, Viden Aff., Exh. 13, Doe VII Aff., Exh. 14, Doe VIII).

Defendants point out that assault weapons by any other name are just as dangerous, and consequently need to be banned. Nonetheless, it is inconceivable that any legislator could list all prohibited weapons, given their sheer numerosity and the ever evolving development of new weapons, often based on old designs. For example, defendants note that an April, 1998 Department of Treasury study found that 39 models of semiautomatic rifles were based on the AK47 design alone. (Defendants' Exh. F, Treasury Study, p. 2). According to the defendants, facts such as these necessitated the prohibition on "substantially identical" weapons.

The phrase 'substantially identical,' while the subject of much confusion, does not so lack a 'core' such that it should be declared facially vague at this time. Standing alone, the phrase is without meaning. But by reference to the prohibited list of weapons, the prohibited characteristics contained in the other definitions of assault firearms, and just a cursory examination of pictures of prohibited weapons, this court cannot conclude that the law is vague 'in all of its applications.' *See State v. Elrose*, 277 N.J.Super. 548, 556, 649 A.2d 1351, 1355 (App.Div.1994) (Inoperability provision not vague, in part because "legislative intent can be gleaned by reading statutes in pari materia, and by reviewing related sections as a whole."); *see also State v. Sharkey*, 204 N.J.Super. 192, 198, 497 A.2d 1291, 1294–95 (1985) ("It is clear to us that persons of ordinary intelligence would understand this legislation to proscribe the distribution of, or possession or control with the intent to distribute, substances which are represented as, or substantially similar in physical

appearance to, controlled dangerous substances. That the Legislature chose not to set forth a detailed listing of all proscribed activity relating to the distribution of look-alike substances, but instead utilized a general approach in describing the illegal conduct, does not render the legislation void for vagueness.") (citations omitted). Significantly, as well, the Attorney General has issued guidelines available to the general public regarding this phrase. (Defendants' Exh. B, Attorney General Guidelines). While the Legislature may not have been perfectly clear in its definitions, the Attorney General negated some of the confusion. A court should consider limiting constructions of the law offered by enforcement agencies. *See Hoffman Estates*, 455 U.S. at 494, 102 S.Ct. at 1191. Under these circumstances, the phrase 'substantially identical' cannot be said to completely lack a core.

Another definition attacked as vague defines a prohibited 'assault firearm' as "a semiautomatic shotgun with either a magazine capacity exceeding six rounds, a pistol grip, or a folding stock." N.J.S.A. 2C:39–1w(3). The plaintiffs confess confusion from the application of either/or to three prohibited characteristics: "[m]ust the shotgun have two or only one of the three characteristics [to be prohibited]?" (Plaintiffs' Br., 7/24/98, p. 32). The reference to 'pistol grips' and its definition as a 'well-defined handle' and 'protrud[ing] conspicuously' beneath the action of the weapon, is also criticized for failing to define in inches or degrees what this actually means. Plaintiffs also claim that they have no way of knowing whether, hypothetically, the magazine capacity of the weapons they own could exceed six rounds of non-standard, shorter, shot-gun shells.[20]

These arguments, however, are unavailing and disingenuous. Grammatical inaccuracies like the one alleged here do not make the law vague. It is clear that only one characteristic renders the weapon prohibited. Moreover, a failure to specify in inches what 'well-defined' or 'conspicuously protruding' handles means is irrelevant when a review of pictures of the weapons so obviously portrays what prohibited characteristics the law was referring to. (*See, e.g.,* Defendants' Exh. Q and T, Weapon's Advertisements; Exh. F, Treasury Study, Exh. 3). The law cannot be vague in all of its applications when it obviously applies to some of these weapons. Moreover, Congress employed much the same terminology itself in federal legislation which then caused manufacturers to alter weapon designs, *see* 18 U.S.C. § 921(a)(30)(B)(ii), which lends substantial credence to defendants' claim that the definition is not vague in all of its applications. Finally, the possibility of shorter, non-standard shells, which may or may not be in existence for many of the weapons cited by the plaintiffs, is irrelevant when the statute's prohibition clearly encompasses the standard shells intended for the magazine. In other words, the definition is not vague in all of its applications.[21]

With respect to the definition of 'assault firearms,' N.J.S.A. 2C:39–1w(5) includes "any combination of parts from which an assault firearm may be readily assembled."

---

**20.** For example, in his affidavit, plaintiff John Doe III states the following:

> I own a Remington Model 11–87 12 gauge shotgun stamped '2 ¾ or 3″ Magnum' which holds 5 or 6 of such shotgun shells, but which could hold more than 6 rounds of shorter, non-standard shotgun shells. I own no such shorter shells.

(Plaintiffs' Exh. 9, John Doe III Aff., ¶ 4).

**21.** For the same reason, plaintiffs' challenge to the prohibition on rifles with fixed magazine capacities over 15 rounds, and the prohibition on large capacity magazines is also unavailing. Plaintiffs' claims, for instance, that John Doe I and II "have no way of knowing whether their magazines will hold and function with more than 15 rounds of shorter ammunition[,]" (Compl.¶ 74), and that the statute "[a]s applied to tubular magazines which may be loaded with different amounts of rounds of ammunition depending on cartridge length" is thus vague, is of no consequence in light of the standard applied to this facial vagueness challenge.

According to the plaintiffs, the terms 'readily' does not inform a person of the time (in hours and minutes) it must take to assemble such an assault firearm, or whether that time is intended for an average person or an expert in such weapons. Moreover, fault is found in the fact that the legislation does not specify whether "a full machine shop or only common hand tools make the parts capable of being readily assembled." (Plaintiffs' Exh. 1, Johnson Aff. p. 19). The court agrees with plaintiffs' description of the law, but disagrees with the conclusions drawn therefrom.

Plaintiffs cite to *Peoples Rights Organization v. City of Columbus,* in which a District Court determined that virtually identical language in the City of Columbus' assault weapons ban law was void for vagueness. 925 F.Supp. 1254, 1268–69 (S.D.Ohio 1996). This portion of the District Court's opinion was affirmed by the Sixth Circuit, *Peoples Rights Organization, Inc. v. City of Columbus,* 152 F.3d 522, 538 (6th Cir.1998) (phrase 'may .be readily assembled' does not provide sufficient information to an average person to determine whether a particular combination of parts is within city ordinance's scope), which ultimately found that all definitions of prohibited assault firearms were unconstitutionally vague. *Id.* at 538.

Despite this persuasive authority to the contrary, this court does not find the reasoning employed therein to be persuasive. These courts invalidated Columbus' assault weapons law based upon a heightened standard of review, which this court will not apply in this facial vagueness challenge. For the reasons explained above, this court does not believe that a heightened level of scrutiny should apply to this facial challenge of a criminal law, especially when the statute neither reaches significant constitutionally-protected conduct, nor provides unfettered discretion to "policemen, prosecutors, and juries to pursue their personal predilections." *Kolender,*

461 U.S. at 358, 103 S.Ct. at 1858 (internal citations omitted).

While the record demonstrates difficulties in application, nothing indicates the use of arbitrary, unfettered discretion in applying the statute. Under these circumstances, the court seeks guidance from the Second Circuit, and its consideration of a similar challenge to New York City's ban on certain assault weapons and ammunition feeding devices. *See Richmond Boro Gun Club, Inc. v. City of New York,* 97 F.3d 681, 684–86 (2d. Cir.1996) (law not facially vague because "it is obvious in this case that there exist numerous conceivably valid applications of Local Law 78.") Similar to the phrase "designed ... for use with illegal cannabis or drugs," which was upheld by the Supreme Court in the *Hoffman Estates* case, the disputed phrase here—"any combination of parts from which an assault firearm may be readily assembled"—is not vague in all of its applications because it would surely apply to an otherwise prohibited weapon which was merely altered by removing a single design feature. That plaintiffs can posit ambiguous applications is again, not the issue. Surely the Legislature, intent on reaching assault weapons which could be altered in minor ways or disassembled to avoid the purview of the other assault weapon definitions, did not have to specify in hours and minutes and with reference to specific tools and degrees of knowledge the parameters of what 'readily assembled' means. The precision in drafting which plaintiffs demand is neither constitutionally required nor perhaps even possible or advisable given the confines of language in which we all operate. "The Constitution does not require impossible standards." *United States v. Petrillo,* 332 U.S. 1, 7, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947). The issue then is whether the statute completely lacks a core, which plaintiffs have failed in this challenge to demonstrate.

(b) Inoperable Weapons

Plaintiffs also challenge, on vagueness grounds, the constitutionality require-

ments relating to inoperable weapons. Nonetheless, these challenges fail for much the same reason as above. This court has no difficulty upholding the provision relating to inoperable weapons. It has a core to its meaning as is evident from John Does IV and V's voluntary compliance with it. (*See* Defendants' Exh. 10, John Doe IV Aff. ¶ 2; Exh. 11, John Doe V Aff., ¶ 2). Their apprehension of prosecution for legally owning weapons which might have interchangeable parts, and thus render a weapon operable, is misplaced. Without evidence that such prosecutions have happened or are likely to happen, and confident that were they to happen an 'as applied' vagueness challenge would likely be viable against this obscure application of the law, this court concludes that this challenged section is not facially vague.

In conclusion, the challenged sections are not facially vague in all of their applications because the law clearly encompasses at least some of the core conduct in which plaintiffs wish to engage or weapons which plaintiffs wish to or do own. The mere conjecture and hypotheticals that plaintiffs posit with this court as evidence of the vagueness of the statute do not undermine its facial validity. A statute challenged for vagueness does not depend on whether the challengers can posit some obscure and difficult application of the legislation which causes confusion. It is doubtful whether any criminal statute could survive such scrutiny. Indeed, the specific instances and circumstances which plaintiffs point out may suggest difficult applications of the law; but they do not raise these issues as a defense in a criminal prosecution context. The issue then is whether all applications are impermissibly vague. They are not in this case and thus plaintiffs' facial vagueness challenge fails.

## 2. As Applied Vagueness

■ The plaintiffs also challenge the law as it applies to their particular circumstances, some of which have been explained in the facial challenge analyzed

*supra.* To determine whether a statute is unconstitutionally vague as applied, the Supreme Court applies a two-part test: the court must first determine whether the statute "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and then consider whether the law "provide[s] explicit standards for those who apply [the law]." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972) (footnote omitted); *see also Gentile v. State Bar of Nevada,* 501 U.S. 1030, 111 S.Ct. 2720, 2732, 115 L.Ed.2d 888 (1991); *Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. at 1193. As noted, "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. 1186, 71 L.Ed.2d 362. When criminal penalties are at stake, for instance, a relatively strict test is warranted. *Id.* at 498–99, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362. Nonetheless, "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Id.* Thus, while the challenged statute at issue here is criminal in nature, the concern over constitutionally protected rights is notably absent in this case.

Another factor this court must consider is whether or not the law contains any scienter requirement, or whether it imposes strict liability. *Id.* at 499, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362. Indeed, "[i]n the absence of a scienter requirement ... [a] statute is little more than 'a trap for those who act in good faith.'" *Colautti v. Franklin,* 439 U.S. 379, 395, 99 S.Ct. 675, 685, 58 L.Ed.2d 596 (*quoting United States v. Ragen,* 314 U.S. 513, 524, 62 S.Ct. 374, 86 L.Ed. 383 (1942)).

■ On the face of the statute, no level of scienter is required for conviction; mere possession or other dispositions of a prohibited weapon or magazine constitutes an

offense. At least one New Jersey court has interpreted a portion of the law as not requiring scienter. *See State v. Pelleteri*, 294 N.J.Super. 330, 683 A.2d 555, 556 (1996) (proof that defendant knew shotgun was prohibited under the law not required for conviction). Still, when evaluating this challenge to a state law, "a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered." *Hoffman Estates*, 455 U.S. at 494, 102 S.Ct. at 1191.

The Attorney General offers a more limiting construction, at least with respect to weapons which are prohibited because they are 'substantially identical' to listed weapons. In an August 19, 1996 directive issued to the Director of the Division of Criminal Justice, County Prosecutors, and all Law Enforcement Chief Executives, Attorney General Peter Verniero wrote that "prosecutors and police should remember that an assault firearms offense requires proof that the defendant knows he or she possesses an assault firearm, *e.g.*, that the defendant knows that the firearm is 'substantially identical' to one of the named assault weapons." (Defendants' Exh. B, p. 3).[22] In sum, the Attorney General seemingly claims that an element of scienter is required although neither the statute nor the cases interpreting it seemingly require knowledge.

In addition to this Attorney General directive, other guidelines have also been issued attempting to clarify confusing applications of the law. For example, after the law was signed by the Governor, then Attorney General Robert Del Tufo sent a memorandum to all county prosecutors, in an attempt to clarify certain aspects of the law. (Defendants' Exh. D, Memo of 5/29/91). Noted in that memo is N.J.S.A. 2C:39–12, which still permits, even today, one in unlawful possession of an assault firearm to voluntarily surrender such a weapon without fear of criminal prosecution. Also noteworthy was the directive that "New Jersey law protects citizens who, in good faith, diligently pursue all means available to comply with the law." (*Id.* at 2) (citing N.J.S.A. 2C:2–4(c)).

Even prior to that memorandum, however, the Attorney General also issued a determination of which assault firearms were legitimate under the statute for use in competitive shooting matches. The statement included the telephone number to the State Police Firearms Investigation Unit, from which citizens could obtain information. (Defendants' Exh. C, Memo of 8/7/90). This same unit continues to respond to citizen inquiries about assault firearms and also lectures to interested groups. (Defendants' Exh. H, Answers to Interrog. 9). Some of the John Doe plaintiffs used this number or other means in an effort to comply with the law, while others did not. (Defendants' Exhs. I–IX, Answers to Interrog. 2).

■ It is within this factual background and context that plaintiffs now ask this court to declare this state law unconstitutionally vague as applied to several circumstances particular to individual plaintiffs. This court refuses to do so. The particular disputed matters which plaintiffs raise are best left for the New Jersey courts to decide on an individualized case-by-case basis. Plaintiffs have initiated a pre-enforcement challenge to a state law. While significant constitutional questions were raised and thus addressed with respect to the statute as a whole, and although plaintiffs present enough of a controversy for standing and ripeness requirements, this federal court will exercise its discretion and refrain from attempting to decide this as-applied pre-enforcement challenge which is fraught with specula-

---

**22.** This Attorney General opinion followed at least one New Jersey state court case which declared unconstitutional, in a criminal prosecution, N.J.S.A. 2C:39–5f & 2C:39–1w(2) (dealing with the prohibition of weapons 'sub-stantially identical' to the specifically listed weapons). *See* Plaintiffs' Exh. 21, *State v. Robert D. Merrill*, Criminal Ind. No. 95–02–260–1 (Law.Div. February 2, 1996).

tion. For example, plaintiffs present the case of *State v. Pelleteri*, 294 N.J.Super. 330, 683 A.2d 555, 556 (1996), as evidence of the scienter requirement, and in support of striking down this law as vague. Yet the juxtaposition of this case and the contrasting Attorney General's guidelines militate in favor of abstention.

Refusing to rule on an as-applied challenge to an allegedly vague statute when the ordinance would otherwise be facially valid is not without precedent. *See Richmond Boro Gun Club*, 97 F.3d at 686; *Brache v. County of Westchester*, 658 F.2d 47, 52 (2d Cir.1981), *cert. denied*, 455 U.S. 1005, 102 S.Ct. 1643, 71 L.Ed.2d 874 (1982). Moreover, this conclusion is based upon principles of judicial restraint, principles that bear some resemblance to the doctrine of abstention. In the Third Circuit, it is still the "salutary rule that courts should avoid whenever possible a premature adjudication that duly enacted legislation is unconstitutional." *NUI Corp. v. Kimmelman*, 765 F.2d 399, 403 (3d Cir. 1985). While wholesale abstention was not appropriate in this case, restraint in this particular area is peculiarly warranted. "The doctrine ... contemplates that deference to state court adjudication only be made where the issue of state law is uncertain." *Harman v. Forssenius*, 380 U.S. 528, 534, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965). Limiting constructions of the law may render moot what would otherwise be broad pronouncements of state law based on federal constitutional questions.[23] The plaintiffs have not justified such overreaching in this instance. As the Supreme Court instructed recently in *Arizonans for Official English v. Arizona*:

> Warnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law,

for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court. *See Rescue [v. Municipal Court of Los Angeles]*, 331 U.S. [549,] 573–74, 67 S.Ct. [1409,] 1421–23, 91 L.Ed. 1666.

520 U.S. 43, 79, 117 S.Ct. 1055, 1074, 137 L.Ed.2d 170 (1997). *See also Poe v. Ullman*, 367 U.S. 497, 526, 81 S.Ct. 1752, 1768, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting) ("[N]ormally this Court ought not to consider the Constitutionality of a state statute in the absence of a controlling interpretation of its meaning and effect by the state courts.").

Plaintiffs' search for binding constructions on particular facets of a New Jersey law will not be supplied by this federal court when the law is, as in this case, facially valid.

## C. EQUAL PROTECTION

■ In Counts II, IV, VI, IX, XII, and XIII, plaintiffs allege that in different ways New Jersey's assault weapons ban violates the equal protection of the laws, guaranteed under the Fourteenth Amendment to the United States Constitution. Plaintiffs brief explicates several instances where the law is allegedly irrational, and thus violates equal protection. For example, Count II appears to allege that because the Attorney General failed to name several weapons which plaintiffs own as 'legitimate' for target shooting purposes, the classifications are violative of due process. Plaintiffs allege in Count IV that banning the use of certain names on products violates equal protection.[24] Count VI claims that banning firearms by reference to specifically named manufacturers, instead of by generic characteristics, is irrational and thus violates equal protection.

---

23. Significantly, although certainly not determinative of this issue, declaratory judgment actions are permitted in New Jersey. *See* N.J.S.A. 2C:16–50 to 2A:16–62. To this court's knowledge, however, such a challenge is not presently pending.

24. The related complaint based on a violation of free speech is discussed *infra*.

Count IX attacks the prohibition on large capacity magazines, by alleging that the one exception to this prohibition irrationally discriminates against plaintiffs who are non-registrants but who use the magazines in sanctioned marksmanship matches. Count X claims that the Director of Civilian Marksmanship of the United States Department of the Army, as referenced in the statute, is no longer affiliated with the Army, and thus the statute is impossible to comply with. Finally, counts XII and XIII allege equal protection violations based on the law's exemptions for certain government employees, and based on the civil liability which attaches to owners of registered weapons whose weapons are subsequently used in a crime. These challenges on equal protection grounds, while extensive in scope, are without merit and can be rejected as a matter of law.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction, the equal protection of the laws." In *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992), the Supreme Court explained that "[t]he Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *See also Vacco v. Quill*, 521 U.S. 793, ——, 117 S.Ct. 2293, 2297, 138 L.Ed.2d 834 (1997) (the Equal Protection Clause "embodies a general rule that States must treat like cases alike"). If legislation neither burdens a fundamental constitutional right nor targets a suspect classification, it will withstand constitutional scrutiny so long as it bears a rational relationship to a legitimate state interest. *Id.* at ——, 117 S.Ct. at 2297, 138 L.Ed.2d 834 (1997); *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).

 In this case, none of the alleged violations of equal protection violate a fundamental right or burden a suspect class. *See e.g., San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct., 1278, 1294, 36 L.Ed.2d 16, *reh'd denied*, 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973) ("The system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness"); *id.* at 33–35, 93 S.Ct. at 1296–1298 (courts must look to the Constitution, not the "importance" of the asserted right, when deciding whether an asserted right is "fundamental"). There is no fundamental right to weapon ownership here, and the plaintiffs in this case (weapon owners, manufacturers and sellers) are not a suspect class. Accordingly, rational basis review is warranted, and the challenged legislation is constitutionally permissible so long as it bears a rational relationship to a legitimate state interest. The law is also entitled to a "strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993).

The issue for this court then is not whether New Jersey can justify its enactment of the assault weapons ban and how that ban is effected; indeed "[t]he burden [of proof] is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973) (internal quotation marks omitted). This is the case even if the rational basis for the law has no foundation in the record. *Heller*, 509 U.S. at 320–21, 113 S.Ct. at 2643.

While rational basis review is highly deferential, it is not "toothless." *Mathews v. Lucas*, 427 U.S. 495, 510, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976). "[E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained. The search for the link between classification and objective gives substance to the Equal Protection Clause." *Evans*, 517 U.S. at 632, 116 S.Ct. 1620, 134 L.Ed.2d 855.

Despite the alleged problems with the drafting of the assault weapons ban at issue here, plaintiffs cannot meet their heavy burden in showing that this law bears no rational relationship to a legitimate state interest. Clearly, and plaintiffs do not seriously dispute this, the government has a legitimate state interest in the regulation of assault weapons. It was estimated that as of ten years ago, in 1989, Americans owned approximately 1 million assault rifles. Keith R. Fafarman, *State Assault Rifle Bans and the Militia Clauses of the United States Constitution*, 67 Ind.L.J. 187, 189–90 (1991). The numbers of such weapons sought to be imported into this country has grown approximately tenfold over the last decade, to over 1,000,000 in October of 1997. *See Richmond Boro Gun Club*, 896 F.Supp. at 283; Defendants' Exh. F. Treasury Study at 1, n. 1. Such weapons are considered the weapons of choice for drug traffickers, violent offenders and members of organized crime. *See* Defendants' Exh. E, 5/9/91, Testimony of Col. Dintino at 22; *Richmond Boro Gun Club*, 896 F.Supp. at 282–83; Defendants' Exh. F, Treasury Study, at 3, 30–31. Many of these weapons fall into criminal hands when stolen from legitimate owners. Defendants' Exh. E, 5/9/91, Testimony of Winter, at 38.

The rational link between public safety and a law proscribing possession of assault weapons is so obvious that it would seem to merit little serious discussion. Still, it is particular aspects of the law which plaintiffs allege are irrational. For example, in their brief, plaintiffs' claim that "[t]he Attorney General arbitrarily failed to name plaintiffs' firearms, all of which are lawful for target shooting.... Many of these firearms are superior in accuracy and range than the M1 carbine, which shoots an inaccurate cartridge." (Plaintiffs' Br., 7/24/98, at 37). Nonetheless, what plaintiffs point out, however, does not establish an equal protection violation. At most, plaintiffs point out that the Attorney General should have named

more weapons to the 'legitimate' list. But mere underinclusiveness is not actionable. *Katzenbach v. Morgan*, 384 U.S. 641, 657, 86 S.Ct. 1717, 1727, 16 L.Ed.2d 828 (1966) ("[A] statute is not invalid under the constitution because it might have gone farther than it did [and] reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."). Moreover, in so far as plaintiffs' complaint attempts to allege equal protection violations based on disparate classifications of similar weapons, such a claim is not cognizable. The equal protection clause applies only to persons, not products. U.S. Const., amend. XIV, ¶ 1.

A similar analysis controls plaintiffs complaints that the ban on large capacity magazines, which applies to everyone except those who register weapons and use the magazines in competitive shooting matches, violates equal protection. Despite the fact that a registrant may possess unlimited quantities of large capacity magazines while a non-registrant is prohibited from possessing any, there is a rational connection between conditioning possession of such magazines on participation with otherwise banned assault firearms in shooting competitions. The rational link between the two is sufficient for this review. Courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail because it " 'is not made with mathematical nicety or because in practice it results in some inequality.' " *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (*quoting Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)).

A rational link also exists for each of the other challenged facets of the Act. For example, participation in sanctioned shooting competitions is rationally related to maintaining large capacity ammunition magazines. The exemptions in this law

for, among others, prosecutors, police officers and others authorized to possess other firearms, is likewise rational. The Legislature could have determined, for instance, that such individuals sometimes require such firearms in the performance of their duties. Possession of these weapons might also continue into off-duty hours, thereby necessitating the exemption. Whether or not this is true is irrelevant. It nonetheless is a rational basis for the distinctions. Finally, the civil liability provided for under N.J.S.A. 2C:58–12g is likewise not irrational. While the liability seemingly only attaches to registrants (ie. those who comply with the law), this underinclusiveness does not constitute an equal protection violation. The Legislature could have concluded that prospective purchasers of legal assault weapons, confronted by the civil liability provision and other registration requirements, would be dissuaded from consummating the purchase. The fact that the law, as written, could have the unintended effect of persuading individuals to not register weapons (and thus face possible criminal sanctions)`out of fear for the civil liability provision, does not mean the law is irrational. Refining what is otherwise rational is a legislative, rather than judicial, function. Rational basis review involving an equal protection challenge "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 2100–2101, 124 L.Ed.2d 211

(1993). *See, e.g., Dandridge*, 397 U.S. at 486, 90 S.Ct. at 1162.

"The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Metropolis Theatre Co. v. Chicago*, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913). The judiciary is not authorized to "sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (per curiam). Mindful of the judiciary's limited role, this court cannot conclude that the law is irrational and thus violative of equal protection. Accordingly, plaintiffs' motion for summary judgment on Counts II, IV, VI, IX, XII, and XIII and alleging violations of equal protection is denied. Summary judgment is granted in defendants favor on these equal protection claims.

## D. FREEDOM OF ASSOCIATION

█ In Count I of the complaint, plaintiffs maintain that the Act's requirement of membership in a rifle or pistol club as a condition of keeping operable registered assault weapons and large capacity ammunition magazines violates their freedom of association rights guaranteed under the United States Constitution. Plaintiffs specifically point to N.J.S.A. §§ 2C:58–12b[25] and 2C:39–3j[26] as effec-

25. In pertinent part, N.J.S.A. § 2C:58–12b requires:

b. The owner of an assault firearm purchased on or before May 1, 1990 which is on the list of assault firearms determined by the Attorney General to be legitimate for target-shooting purposes shall have one year from the effective date of P.L.1990, c. 32 (C. 2C:58–12 et al.) to register that firearm. In order to register an assault firearm, the owner shall:

. . .

(4) Submit valid proof that the person is a member of a rifle or pistol club in existence prior to the effective date of P.L.1990, c. 32 (C. 2C:58–12 et al.).

Membership in a rifle or pistol club shall not be considered valid unless the person joined the club no later than 210 days after the effective date of P.L.1990, c. 32 (C. 2C:58–12 et al.) and unless the rifle or pistol club files its charter with the Superintendent no later than 180 days following the effective date of P.L.1990, c. 32 (C. 2C:58–12 et al.). The rifle or pistol club charter shall contain the name and address of the club's headquarters and the name of the club's officers.

26. N.J.S.A. § 2C:39–3j provides:

j. Any person who knowingly has in his possession a large capacity ammunition

tively "precondition[ing] a continued liberty and property right not on lawful ownership of the property before a specified date, but on membership in certain private clubs before a specified date." (Compl.¶ 38). Plaintiffs support this argument with allegations that less than 5% of the members of currently registered clubs are women, and that noncitizens may not join some of the clubs. Furthermore, many of the registered clubs are affiliated with the National Rifle Association ("NRA") and promote hunting, an organization and an activity which individuals may be loathe to support. Nonetheless, the law as written requires membership in such clubs as a condition of maintaining property and a liberty interest.

This court does not disagree with plaintiffs' general description of the law and its requirement of a rifle or gun club membership, and participation in sanctioned shooting matches, in order to maintain, in operable form, certain assault weapons deemed 'legitimate' by the Attorney General. The initial determination for this court, however, is the standard of scrutiny to apply to this provision. The plaintiffs do not address this question straightforward. However, from the citation to numerous cases, it appears they attempt to implicate a fundamental right, and thus argue that a heightened level of scrutiny, such as strict scrutiny, should apply. Defendants on the other hand claim that the membership requirement implicates no First Amendment rights, but that even if it did, the law is still a valid exercise of legislative power.

This court readily acknowledges that among the rights protected by the First Amendment is the freedom of association. *NAACP v. Alabama*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). The right to free association is correlative to an individual's right "to speak, to worship, and to petition the government for the redress of grievances." *Roberts v. United States Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984). The Supreme Court has acknowledged that this right of association also has a necessary corollary; the right of nonassociation. In *Wooley v. Maynard*, the Court explained: "A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts. The right to speak and the right to refrain from speaking are complementary components of the broader concept of "individual freedom of mind." " 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977).

Plaintiffs suggest that this right not to associate is infringed by New Jersey's law which makes membership in private gun and rifle clubs a requirement of continued possession of certain assault weapons. In other words, plaintiffs allege that they are being coerced to associate with groups holding views with which they disagree. They liken this case to *Gavett v. Alexander*, in which a requirement of NRA membership to purchase, at cost, surplus army rifles was struck down because it violated the First Amendment's implicit right of non-association. 477 F.Supp. 1035, 1049 (D.D.C.1979).

Even though *Gavett* is not controlling on this court, it is nevertheless distinguishable from this case. First, in *Gavett*, the District Court concluded that the NRA membership requirement survived neither a strict scrutiny test (if indeed the law burdened a fundamental right) nor rational basis review. *Id.* at 1049 ("In short, there is no rational basis for the statute and it is invalid even under the less rigid test for determining constitutionality.") Thus, the court did not definitively conclude that NRA membership as a requirement of a

---

magazine is guilty of a crime of the fourth degree unless the person has registered an assault firearm pursuant to section 11 of P.L.1990, c. 32 (C. 2C:58–12) and the magazine is maintained and used in connection with participation in competitive shooting matches sanctioned by the Director of Civilian Marksmanship of the United States Department of the Army.

government benefit infringed on the fundamental right of non-association. Second, *Gavett* concerned a compelled club membership for the receipt of a governmental benefit—ie. at cost purchases of surplus weapons which provided a significant monetary savings. *See id.* at 1039 n. 5. For the present case to be considered the same, retention of otherwise banned assault weapons and large capacity ammunition magazines must be akin to the privilege of purchasing governmental property at a discount. It is not the same, and this is constitutionally significant.

The former benefit is essentially legislative protection, albeit with conditions, of the ownership and/or reliance interests of assault firearm owners. This is a legitimate governmental interest. *See City of New Orleans v. Dukes,* 427 U.S. 297, 305, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (upholding a grandfather clause). The latter benefit challenged in the *Gavett* case was not the legitimate protection of a reliance interest; it was an arbitrary and irrational governmental preference for NRA members. The same cannot be said of the challenged statute here, which links retention of certain assault firearms with membership in organizations in which one could actually use such weapons for a legitimate purpose.

This distinction accords with other cases which have prevented the state from requiring association with a private entity as a prerequisite to receiving public benefits. These rights are quite different than the right to retain functioning assault firearms and large capacity magazines, a right which the Legislature could have abrogated completely. For example, patronage dismissals of public employees because of

political affiliation may violate the First Amendment's right to association. *See Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The Supreme Court explained the underlying rationale in *Perry v. Sindermann:*

> [The government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests, especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.

408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).

Plaintiffs attempt to fit into this rationale the 'governmental benefit' of retaining otherwise banned assault firearms and large capacity ammunition magazines. But such a benefit, the protection of a reliance interest which need not have been granted, is not akin to employment.

Nor is the association required in this instance necessarily political or infused with beliefs which would be offensive to those wishing to retain certain weapons and compete in shooting matches. Despite plaintiffs' contentions that individuals did not join clubs for various reasons,[27] the record also reveals that many of these clubs are public in nature, and spread throughout New Jersey (Defendants' Eh. H, Answer to Interrog. 9 and Exh. M). Based on all of these considerations, rational basis review is warranted. *See, e.g.,*

---

**27.** Richard Miller, Chairman of the Coalition of New Jersey Sportsmen, Inc., explained why some individuals did not and will not join gun clubs:

some disagreed with the beliefs or principles of a club, including on political issues, conservation issues, or otherwise; some *could not afford the membership fees;* some did not qualify because they were not acquainted with and thus could not be en-

dorsed by existing members; some did not choose to join a club because they did not wish to be associated with the other members of a specific club; some clubs were filled to capacity and did not have any open membership; and some Coalition members did not reside within a convenient distance of a club.

(Plaintiffs' Exh. 2, Miller Aff., ¶ 10).

*Besig v. Dolphin Boating and Swimming Club,* 683 F.2d 1271 (9th Cir.1982) (requirement of membership in groups of "apolitical nature" which "advocate no special view or philosophy that appellants have identified as offensive" in order to receive favorable access to public land not in violation of First Amendment).

Having determined that no fundamental right is implicated in the club membership requirement, rational basis review is warranted. Not surprisingly, membership in a sanctioned shooting club as a requirement for maintaining, in operable form, otherwise prohibited assault weapons and large capacity ammunition magazines is rational. While the Legislature clearly intended that the law be broad enough to reach potentially deadly assault weapons, it was equally concerned with preserving the rights of individuals who legitimately use such weapons for shooting competitions. (*See* Plaintiffs' Exh. 18, Del Tufo Testimony). Thus, the nexus between ownership and shooting competitions is entirely rational. Accordingly, plaintiffs motion for summary judgment on this grounds is denied, while defendants motion is granted.

## E. FREEDOM OF SPEECH

■ Count IV of the complaint contends that the law violates plaintiffs right to free speech. According to the plaintiffs [b]y defining prohibited firearms based on their names, without regard to any generic definition and or the fact that firearms with different features may have a common name, N.J.S.A. § 2C:39–1w(1) violates the rights to free speech and press of plaintiffs ArmaLite and Springfield, and denies the equal protection of the laws to all plaintiffs, contrary to the First and Fourteenth Amendments to the United States Constitution. (Compl.¶ 89). The gravamen of this complaint appears to be that because the challenged statute prohibits certain weapons which were specifically-named in the Act, the ban applies not to specific prohibited

characteristics that make the weapons dangerous, but rather to specific words. Springfield and ArmaLite protest that this is a prior-restraint on free speech because each company is limited to what it can name new weapons which may in fact not have any characteristics which this legislation was attempting to prohibit. Indeed, in 1994 a Federal Assault Weapons Law went into effect which caused many weapons manufacturers to reconfigure their products to comply with the new law. Nonetheless, the names on the weapon remained the same based on the marketing advantage given product name recognition. (*See* Plaintiffs' Exh. 2, Miller Aff., ¶ 26; Exh. 5, Springfield Inc. Aff., ¶ 12; Exh. 6, ArmaLite Aff., ¶¶ 10–11). Thus according to ArmaLite's President, "ArmaLite is discouraged in marketing [a modified ArmaLite AR–180] because of jurisdictions such as New Jersey which prohibit the sale or possession of any firearm with the term "ArmaLite AR–180" stamped on it." (Plaintiffs' Exh. 6, ArmaLite Aff., ¶ 11).

Neither side of this issue squarely addresses the appropriate level of scrutiny to apply to this case. Plaintiffs describe the effect of the ban in an apparent attempt to implicate heightened scrutiny but they conclude that "[b]anning firearms by what is written on them has no rational basis...." (Plaintiffs' Br., 7/24/98, at 11). Defendants implicitly argue for rational basis review by writing that "[t]he statute bars no speech[,]" but the brief also concludes with an analysis of this case applied to the jurisprudence of commercial speech. (Defendants' Br., 7/24/98, at 46–48). An initial determination then, must be made as to what level of scrutiny should apply.

This court notes that this is not the typical commercial speech case which involves either speech "propos[ing] a commercial transaction," *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973), or that is "related solely to the economic interests of

the speaker and its audience," *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). This is not to say that this de facto restriction on certain product names does not implicate First Amendment concerns; it does because in many instances the name of the product can be as alluring a promotion as traditional advertising techniques which, if regulated, clearly would be commercial speech. Nonetheless, the Act in this case does not prohibit or criminalize the naming itself. The Act simply prohibits specific weapons which the Legislature deemed necessary to list specifically in the statute. Admittedly, the indirect effect of these listings are that manufacturers who wish to engage in business in New Jersey are restricted (in a very minor way) how they can name such a weapon. Erring on the side of caution, this court will scrutinize the disputed Act as if it proscribes commercial speech.[28]

In *Central Hudson*, the Supreme Court set forth a less protective standard for evaluating the constitutionality of regulations of commercial speech, holding that the Constitution requires only that (1) the state "assert a substantial government interest"; (2) "the regulatory technique be in proportion to that interest"; and (3) the incursion on commercial speech be "designed carefully to achieve the State's goal." 447 U.S. 557, 564, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980).

There is no doubt that the defendants' interest in regulating assault firearms is sufficient to support a suppression of commercial speech. In light of the evidence of record demonstrating the firepower of

such weapons and their relation to crime, the state interest asserted is substantial.

The last two steps of the analysis "basically involve a consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those ends." *Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 341, 106 S.Ct. 2968, 2977, 92 L.Ed.2d 266 (1986). Thus, does this challenged statute and restriction on speech "directly advance" the government's substantial interest? This court believes the answer to this second question is yes. The Legislature obviously believed, and this belief was reasonable, that by listing specific weapons which would be banned in New Jersey would eliminate the most common, and perhaps most popular, firearms from the state. Listing such weapons was a proportionate means of advancing the state's interest.

Finally, the restrictions on speech in this case—which are minimal to begin with—are designed with enough precision required for such a regulation. In other words, "the restrictions on commercial speech are no more extensive than necessary to serve the government's interest," *Posadas*, 478 U.S. at 343, 106 S.Ct. at 2978, and the government has carried its burden on this issue, *see Edenfield v. Fane*, 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). The record demonstrates the very real harm assault weapons can cause; a ban on some of the most popular weapons can sensibly alleviate the problem. Significantly, it is of little consequence that the restrictive means chosen may not be the "least restrictive means" possible. All that is required is a "reason-

---

**28.** Interestingly, this case could be removed from the ambit of commercial speech jurisprudence due to the fact that the Act generally bans the listed weapons from New Jersey. In a sense then, plaintiffs wish to commercially express themselves on what could be an illegal transaction. And, of course, communications relating to an unlawful activity are afforded no First Amendment protections. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S.

748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) ("[T]here is no claim that the transactions proposed in the forbidden advertisements are themselves illegal in any way."); *Nordyke v. Santa Clara County*, 110 F.3d 707, 710 (9th Cir.1997) (Offer to pay 'hit man' one million dollars accorded no First Amendment protection). Nonetheless, this reasoning appears unduly circular and designed only to avoid reaching the harder analytical questions.

able fit" between the legislative end and the means chosen. *See Board of Trustees of State University of New York v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 3034–35, 106 L.Ed.2d 388 (1989). This is not a case where the State of New Jersey attempted to ban all advertisements of assault firearms. Rather, it is a ban on a limited subset of weapons, some of which are specifically named in the statute. Such a means, while perhaps not the least restrictive means possible which could have in turn avoided these free speech questions, was permissible under each prong of the *Central Hudson* test.

Confined to words as we all are, the legislature was free to designate specific weapons and such designations do not implicate an impermissible restraint on plaintiffs' commercial free speech rights. Under these circumstances, plaintiffs' motion for summary judgment is denied, and defendants' motion on this matter is granted.

## F. BILL OF ATTAINDER

■ In Count VII, plaintiffs final allegation is that N.J.S.A. §§ 2C:39–1w, 5f, and 9g constitute bills of attainder because it is unlawful for Springfield and ArmaLite to sell products they have made while similar "[f]irearms . . . manufactured by others may be freely sold and possessed." (Compl.¶¶ 104–107). While it is true that certain models of Springfield and ArmaLite weapons are listed as prohibited weapons, their contentions that this constitutes bills of attainder are clearly without merit.

■ Art. I § 10 of the United States Constitution provides in pertinent part that "[n]o state shall . . . pass any Bill of Attainder . . ." In essence, a bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Administrator of General Services,* 433 U.S. 425, 468, 97 S.Ct. 2777, 2803, 53 L.Ed.2d 867 (1977). A plaintiff challenging a legislative act on the ground that it is an unconstitutional bill of attainder must

prove three elements: nonjudicial infliction of punishment; specificity as to the identity of individuals affected; and lack of a judicial trial. *See* 16B Am.Jur.2d Constitutional Law § 671 (1998). These elements must be established by the "clearest proof." *Communist Party of the United States v. Subversive Activities Control Bd.,* 367 U.S. 1, 83, 81 S.Ct. 1357, 1403, 6 L.Ed.2d 625 (1961).

■ The initial question this court must consider is whether or not the legislation constitutes punishment. Three inquiries are normally made to determine whether a statute inflicts punishment that implicates the Constitution: (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a[n] . . . intent to punish." *Selective Serv. Sys. v. Minnesota Pub. Interest Research Group,* 468 U.S. 841, 852, 104 S.Ct. 3348, 3355, 82 L.Ed.2d 632 (1984) (statute denying federal student aid to males who fail to register for draft does not inflict punishment within meaning of Bill of Attainder Clause) (*quoting Nixon,* 433 U.S. at 473, 475–76, 478, 97 S.Ct. at 2806, 2807–08).

Traditional punishments include "imprisonment," "banishment," "punitive confiscation of property," and prohibition of "designated individuals or groups from participation in specified employments or vocations." *Nixon,* 433 U.S. at 474, 97 S.Ct. at 2806. The type of punishment about which Springfield and ArmaLite protest clearly is not of the type "traditionally judged to be prohibited by the Bill of Attainder Clause." *Id.* at 475, 97 S.Ct. at 2806. At most, the legislation is a form of economic punishment, not traditionally cognizable under the bill of attainder prohibition. Thus, the economic punishment about which the weapon manufacturers complain, even if cognizable, is indirect

and does not amount to punitive confiscation.

Likewise, the New Jersey weapons assault ban "reasonably can be said to further nonpunitive legislative purposes." *Id.* at 475–76, 97 S.Ct. at 2806–07. The comprehensive nature of the assault weapons ban evinces the Legislature's concern that assault weapons present a danger to human life, and thus should be banned. In other words, "legitimate justifications for passage of the Act are readily apparent." *Id.* at 476, 97 S.Ct. at 2807.

Finally, nothing in the weapons ban "evinces a[n] ... intent to punish." *Id.* at 478, 97 S.Ct. at 2808. There is no indication that the New Jersey Legislature's motivation was anything other than a legitimate desire to protect the safety and welfare of the citizens of the state. Despite plaintiffs' allegations that "[f]irearms with the same calibers and firing capacities manufactured by others may be freely sold and possessed," (Compl.¶ 106), it is quite significant that the legislation actually casts a much wider net, banning similar weapons by specific name, as well as banning weapons which are 'substantially identical' to a listed weapon. *See* N.J.S.A. 2C:39–1w(2). As the *Nixon* Court concluded, "the Act's specificity ... does not automatically offend the Bill of Attainder Clause." *Id.* at 471–72, 97 S.Ct. at 2804–05. This court cannot say that the Legislature intended to punish Springfield and ArmaLite specifically; its intent was to control particular types of weapons.[29]

Because this court determines that the inclusion by name of Springfield and ArmaLite weapons on the list of banned weapons is not punishment, the court need not reach the other two facets of this doctrine. New Jersey's assault firearms ban does not constitute a prohibited bill of attainder.

### *CONCLUSION*

For the foregoing reasons, defendants' motion for summary judgment will be granted, while plaintiffs' motion is denied. An appropriate order bearing the date of this decision will be entered in accordance with this opinion.

---

29. Plaintiffs' reliance on *SBC Communications, Inc. v. Federal Communications Comm'n,* 981 F.Supp. 996, 1001 (N.D.Tex. 1997), which invalidated a law aimed at certain Bell Companies, is misplaced. Better guidance is sought and found in *Fresno Rifle and Pistol Club, Inc. v. Van De Kamp,* 965 F.2d 723, 727–28 (9th Cir.1992), which rejected virtually the identical bill of attainder challenge asserted here against a California firearms ban. *See also Springfield Armory, Inc. v. City of Columbus,* 805 F.Supp. 489, 493–96 (S.D.Ohio 1992), *rev'd on other grounds,* 29 F.3d 250 (6th Cir.1994).