**CENTER FOR DISEASE DETENTION, LLC.,**
Plaintiff,

v.

**John RULLAN, etc., Defendant.**

No. CIV. 01–1735(JAF).

United States District Court,
D. Puerto Rico.

Sept. 30, 2003.

**2.** *Falú v. Secretary of Health & Human Servs.,*   703 F.2d 24 (1st Cir.1983).

Juan R. Marchand–Quintero, San Juan, PR, for Center of Disease Detection, LLC, plaintiff.

Carlos E. Lopez–Lopez, Llovet–Zurinaga & Lopez P.S.C., Hato Rey, PR, Carlos Del–Valle–Cruz, Department of Justice, Federal Litigation Division, San Juan, PR, for John Rullan, in his capacity as Secretary of the Department of Health of the Commonwealth of Puerto Rico, defendant.

## OPINION AND ORDER

FUSTE, District Judge.

Plaintiff, Center for Disease Detection, L.L.C. ("Plaintiff CDD"), brings the present complaint against John Rullan, Secretary of the Department of Health of the Commonwealth of Puerto Rico ("Defendant"), in his official capacity. *Docket Document No. 1.* Plaintiff seeks a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, pronouncing Act No. 97, of June 25, 1962 and Health Department Regulation No. 92 of, February 5, 1999, unconstitutional for their alleged per se and as applied violation of the Dormant Commerce Clause.

Plaintiff moves for summary judgment. *Docket Document Nos.18.* Defendant opposes the motion and forwards his own summary judgment motion. *Docket Document No. 25.*

## I.

### *Factual and Procedural Synopsis*

Unless otherwise indicated, we derive the following factual summary from the statement of uncontested facts submitted by Defendant in his motion for summary judgment and by Plaintiffs in their opposition. *Docket Document Nos. 47, 55, 56, 70.*

Plaintiff Center for Disease Detection is a limited liability company formed under the laws of the state of Delaware, with clinical laboratory facilities in San Antonio, Texas, and authorized to do business in Puerto Rico since June 30, 2000. *Docket Document No. 1.*

Plaintiff CDD is fully certified to conduct clinical testing under the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), 42 U.S.C. 263a(b) (2003). The CLIA requires that laboratories performing testing on human specimens be certified by the Secretary of Public Health of the United States, including those in Puerto Rico. 42 U.S.C. § 493.2.

Defendant John Rullán is Secretary of the Department of Health in Puerto Rico. He is responsible for, *inter alia,* dictating, repealing, and amending regulations with the purpose of preventing and suppressing infectious, contagious or epidemic diseases. 3 L.P.R.A. § 178. These regulations, when approved by the Governor of Puerto Rico, have the force of law. 3 L.P.R.A. § 179.

On December 5, 1992, Puerto Rico's Health Department requested exclusion from the CLIA regulations, a petition which was denied on May 10, 1995. Notice: Denial of Exemption of Laboratories

in the Commonwealth of Puerto Rico, 62 Fed.Reg. 5433 (Health Care Financing Administration Feb. 5, 1997). The decision was appealed but was again denied and, therefore, became final on October 28, 1996. *Id.* The ground for rejection was that "several of Puerto Rico's personnel standards did not meet the respective CLIA condition level requirements and that the Commonwealth's laboratory licensure requirements, especially as applied to tests performed by physicians, were less stringent than CLIA requirements." *Id.*

After this final denial, Puerto Rico's Department of Health repealed the Department's Regulation No. 83. On February 9, 2000, it introduced amendments to Regulation No. 92 requiring that all of Puerto Rico's laboratories fulfill CLIA requirements.

On June 6, 2000, the Department of Health issued a public notice in a local newspaper requesting proposals for the analysis of specimens for the detection of sexually-transmitted diseases. *Docket Document No. 1, Exh. B.* The public notice referred to a "request for proposal" ("RFP") available at the Department of Health. It stated, in part, that "[t]he Government of Puerto Rico Department of Health requests the presentation of proposals for the contracting of Clinical Laboratory services for the completion of certain tests for the detection of sexually transmitted diseases." *Docket Document No. 1, Exh. C.* The public notice and RFP issued by the Department of Health omitted any notice that the participating clinical laboratory was required to have a license issued by the Department of Health.

On November 13, 2000, the Department of Health and CDD executed a contract in accordance with the public notice published on June 6, 2000. The contract hiring Plaintiff CDD to process and analyze specimens for the detection of sexually-trans-mitted diseases provides that Plaintiff CDD:

> shall perform and deliver to the [Commonwealth Health Department] the services of gathering, processing and analyzing of laboratory specimens for the detection of sexually transmitted diseases that are described and enumerated later on for all of the [Department of Health's] requirements for such services during the term of this agreement, and shall perform such services in conformity with the established regulations and procedures of the Institute of Laboratories of the Department of Health and the terms and conditions of this agreement.

The specimens were to be drawn from patients by the Health Department. The Department was also responsible for placing the samples in "appropriate containers." In this manner, the Department assured itself that the specimens were properly drawn and packed for transport. Plaintiff CDD had to gather the packed samples from thirteen of the Health Department's designated localities, and transport them to the laboratory for analysis. CDD's personnel collected the samples twice a day, and, on the same day, sent the packages by Federal Express to Plaintiff's CDD laboratory in San Antonio, Texas. All the clinical analyses were performed at this laboratory.

Plaintiff CDD began performing under the contract with the Department of Health in December 2000. In January 2001, the Department of Health stopped delivering specimens to CDD, arguing that CDD could not perform the contract without a Puerto Rico clinical analysis laboratory license.

At the time CDD entered into the contract with the Department of Health, it did not have the license required by Law No. 97 and Regulation 92. Defendant claims

that neither Plaintiff CDD nor any other out-of-state clinical laboratory has applied for the license.

On December 1, 2000, the College of Medical Technologists of Puerto Rico and the Association of Private Clinical Laboratories of Puerto Rico filed a civil action before the San Juan Section of the Court of First Instance of the Commonwealth of Puerto Rico seeking to void the contract between the Department of Health and Plaintiff CDD for Plaintiff CDD's failure to have a license issued by the Secretary of Health for the operation of a clinical laboratory. On December 29, 2000, the Commonwealth court found that CDD had not complied with the license requirement and that its contract with the Department of Health was, therefore, void.

On January 16, 2001, Plaintiff CDD asked the Court of First Instance to declare the sentence null, arguing that because the sentence affected its contractual rights, it was an indispensable party that needed to be joined in the action. On February 28, 2001, the Court of First Instance denied the request, finding that because it was an action directed at a public functionary, the Secretary of the Department of Health, the Plaintiffs were not an indispensable party. Furthermore, having already issued an opinion, the Court of First Instance found that even if Plaintiff CDD were indispensable, it would be inappropriate to join an indispensable party.

Plaintiff CDD then filed a motion requesting that the decision be declared null for lack of an indispensable party. On February 28, 2001, the Court of First Instance denied said request. Plaintiff CDD appealed. On June 29, 2001, the Puerto Rico Court of Appeals determined that Plaintiff CDD was necessary and returned the case for continuation of the proceedings with Plaintiff CDD as a party. On October 19, 2001, the Supreme Court of Puerto Rico denied a writ of certiorari filed by the College of Medical Technologists. The Court of First Instance dismissed the case as moot. At present, judicial proceedings are no longer pending before a state forum.

On June 1, 2001, Plaintiff CDD filed the present case, requesting relief under the Declaratory Judgment Act and asking this court to clarify the rights and obligations of the parties. On November 1, 2001, Plaintiff CDD filed a motion for summary judgment. *Docket Document No. 18.* Plaintiff forwards two arguments in favor of its summary judgment motion. First, it contends that Puerto Rico's laboratory licensing scheme does not apply to Plaintiff CDD's activities. Second, if the licensing scheme were applicable, Plaintiff CDD argues that it is an unreasonable and discriminatory application of the law which violates the Dormant Commerce Clause in violation of the United States Constitution. Plaintiff CDD maintains that it has a valid license under the Federal Clinical Laboratory Improvement Amendments of 1988 and an enforceable contract with the Department of Health.

Defendant opposes the motion. *Docket Document No. 25.* Defendant forwarded abstention and res judicata arguments which have been rendered moot by the dismissal of the pending state actions.[1] Defendant further submits that Plaintiff's cause of action is barred by the Eleventh Amendment as interpreted in *Pennhurst*

---

1. Since *Younger* premises abstention on the existence of an ongoing state judicial proceeding, Defendant's abstention challenges no longer apply. *Brooks v. New Hampshire Supreme Court,* 80 F.3d 633, 638 (1st Cir.1996).

Since there was no final judgment in the state case, res judicata is equally inapplicable. *Baez–Cruz v. Municipality of Comerio,* 140 F.3d 24, 28–29 (1st Cir.1998).

*State School & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), and that the commerce clause is inapplicable to the circumstances in the case at bar.

## II.

### A. Standard for Summary Judgment

The standard for summary judgment is straightforward and well-established. A district court should grant a motion for summary judgment "if the pleadings, depositions, and answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgement as a matter of law." FED. R. CIV. P. 56(c); *see Lipsett v. Univ. of P.R.,* 864 F.2d 881, 894 (1st Cir.1988). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law," and "genuine" if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The burden of establishing the nonexistence of a genuine issue as to a material fact is on the moving party. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden has two components: (1) an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and (2) an ultimate burden of persuasion, which always remains on the moving party. *See id.* In other words, "[t]he party moving for summary judgement, bears the initial burden of demonstrating that there are no genuine issues of material fact for trial." *Hinchey v. NYNEX Corp.,* 144 F.3d 134, 140 (1st Cir.1998). This burden "may be discharged by showing that there is an absence of evidence to

support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. After such a showing, the "burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997) (citing *Celotex,* 477 U.S. at 322–25, 106 S.Ct. 2548).

Although the ultimate burden of persuasion remains on the moving party and the court should draw all reasonable inferences in favor of the nonmoving party, the nonmoving party will not defeat a properly supported motion for summary judgment by merely underscoring the "existence of some alleged factual dispute between the parties"; the requirement is that there be a genuine issue of material fact. *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505; *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993). In addition, "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Under Rule 56(e) of the Federal Rules of Civil Procedure, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see also Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Summary judgment exists to "pierce the boilerplate of the pleadings," *Wynne v. Tufts Univ. Sch. of Med.,* 976 F.2d 791, 794 (1st Cir.1992), and "determine whether a trial actually is necessary." *Vega–Rodriguez v. P.R. Tel. Co.,* 110 F.3d 174, 178 (1st Cir.1997).

### B. Declaratory Judgment Act

The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, "empowers a federal court to grant declaratory relief in a case

of actual controversy. It is designed to enable litigants to clarify legal rights and obligations before acting upon them." *Ernst & Young v. Depositors Economic Protection Corp.*, 45 F.3d 530, 534 (1st Cir.1995); *see also DeNovellis v. Shalala*, 124 F.3d at 313. The Act "is uncommon in that it neither imposes an unflagging duty upon the courts to decide declaratory judgment actions nor grants an entitlement to litigants to demand declaratory remedies." *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488 (1st Cir.1992). "By the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).

## III.

### *Analysis*

Plaintiff CDD moves for summary judgment, requesting that this court determine that the Department of Health's licensing laws do not apply to Plaintiff CDD or, in the alternative, that the licensing laws are unconstitutional. In its cross-motion for summary judgment, Defendant avers that this court is barred from hearing this case by the Eleventh Amendment as interpreted in *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Finally, Defendant avers that the licensing requirements do not violate the Dormant Commerce Clause.

### A. *Standing*

Defendant has not challenged Plaintiff's standing to bring this case. Although neither party has addressed the issue, it is our duty to inquire sua sponte into our subject matter jurisdiction. *Chaparro–Febus v. Local 1575*, 983 F.2d 325, 329 n. 4 (1st Cir.1992).

■ To establish standing, Plaintiff must show that: (1) it suffered a concrete and particularized injury in fact; (2) the injury is fairly traceable to the conduct of Defendant; and (3) it is likely that the alleged injury will be redressed by the requested relief. *Sea Shore Corp. v. Sullivan*, 158 F.3d 51, 55 (1st Cir.1998). The injury-in-fact element requires that Plaintiff have suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■ The injury in this case, Plaintiff's loss of its contract with the Department of Health, is evident. Furthermore, the contract was vitiated by Defendant because of the alleged application of state law. Finally, Plaintiff's injury would be fairly redressed by an action finding the state law unconstitutional or inapplicable to Plaintiff CDD's business.

Prudential standing concerns are inapplicable. *New Hampshire Right to Life Political Action v. Gardner*, 99 F.3d 8, 15 (1st Cir.1996) (noting that, to satisfy prudential standing concerns, the complaint must "fall within the zone of interests protected by the law invoked," the plaintiff "must assert his own legal rights and interests", and the suit must present more than "abstract questions of wide public significance which amount to generalized grievances.")

Here, Plaintiff's claims "implicate its [own] right to operate in interstate commerce free from unconstitutional burdens," *National Pharmacies, Inc. v. De Melecio*, 51 F.Supp.2d 45, 53 (D.P.R.1999), and challenges specific state laws which it argues impinge on that right.

As such, we find that Plaintiff CDD has standing in this case.

## B. *Pennhurst Doctrine*

Defendant maintains that this court is barred from entertaining this suit by *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), contending that the Supreme Court held that federal courts may not entertain causes of action based on state law against state officials. In *Pennhurst*, the Supreme Court held that the Eleventh Amendment bars federal injunctive relief against a state official if (1) " 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be to 'restrain the Government from acting, or to compel it to act,' " *Id.* at 101 n. 11, 104 S.Ct. 900 (quoting *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963)), and if (2) the conduct to be restrained is within the scope of authority delegated to the official by state law, *see id.* at 102, 104 S.Ct. 900. The suit in *Pennhurst* was barred because it involved a pendent claim against state agencies and officers seeking prospective injunctive relief for a violation of state law. The Court declared that "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id.* at 106, 465 U.S. 89.

■ Here, Defendants seek to characterize Plaintiff's causes of action as barred by *Pennhurst*. However, contrary to the circumstances in *Pennhurst*, Plaintiff's complaint is for a declaratory judgment premised on violations under the United States Constitution and the Dormant Commerce Clause. Federal jurisdiction over this claim is based on the existence of a federal question, not on principles of pendent jurisdiction or state law. "While the resolution of these constitutional issues necessarily requires this court to ascertain what state law means, this is a far cry from a prohibited *Pennhurst* type action which seeks injunctive relief on the basis of state law." *Coalition of New Jersey Sportsmen v. Whitman*, 44 F.Supp.2d 666, 672 (D.N.J.1999).

As stated by the Third Circuit,

The ascertainment of state law is an everyday function of the federal court, in cases ranging from those falling within our diversity or pendent jurisdiction, to those brought under section 1983 which claim deprivation of a state-created property right. Indeed, section 1983 would be rendered almost nugatory if federal courts are prohibited, by the eleventh amendment, from deciding matters of state law in cases brought against state officials.

*Id.* at 673 (quoting *Everett v. Schramm*, 772 F.2d 1114, 1119 (3d Cir.1985)).

In accordance with the foregoing, we find that this case is not barred by *Pennhurst* and this court has jurisdiction over the matters before it.

## B. *Commerce Clause*

The Commerce Clause of the Constitution expressly provides Congress with the power to regulate interstate commerce. U.S. Const. art. I, § 8, cl. 3. "Though phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). States are

prohibited from regulating in a manner that would discriminate against or unduly burden interstate commerce and would thereby impede free trade in the national marketplace. *See id.; see Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997).

The first step in evaluating any law under the dormant, or negative, commerce clause "is to determine whether it 'regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce.'" *See Or. Waste Sys.*, 511 U.S. at 98, 114 S.Ct. 1345 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)). In this context, "discrimination" refers to a state's disparate treatment for in-state economic interests as compared to out-of-state interests, benefitting the former while burdening the latter. *Id.* at 99, 114 S.Ct. 1345.

The Commerce Clause also prevents a state statute from being applied to commerce which occurs wholly outside the state's borders, even though it may have effects within the state. *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); *Brown–Forman Distillers v. N.Y. State Liquor Auth.*, 476 U.S. 573, 582–85, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986); *Edgar v. MITE Corp.*, 457 U.S. 624, 641–43, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). Any state regulation which attempts to directly assert jurisdiction over persons or property outside the state's territory exceeds the limits of that state's power. *Edgar*, 457 U.S. at 643, 102 S.Ct. at 2641, 102 S.Ct. 2629. The central question is whether the practical effect of the state law is to control commerce beyond the state's borders. *Healy*, 491 U.S. at 336, 109 S.Ct. 2491. Consequently, a court should view with suspicion a state statute which requires that business operations be done in the home state when they could be done more efficiently out-of-state. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 145, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). Thus, to determine the application of the Dormant Commerce Clause to the captioned case, we need to analyze the state statute.

### 1. *Laboratory Statute*

Law No. 97, of June 25, 1962, as amended, 24 L.P.R.A. § 91 ("Law 97"), provides that

No natural or [juridical] person may establish and operate in Puerto Rico a clinical analysis laboratory, a plasmapheresis center, a seropheresis center or a blood bank, as the same are defined in §§ 91–91i of this title, without a license issued by the Secretary of Health pursuant to the provisions of §§ 91–91i of this title and of the regulations made hereunder.

A "clinical analysis laboratory" is defined as "any institution engaged in the performance of bacteriological, microscopic, hematologic, biochemical, serological, and histopathological tests, to aid in the diagnosis, control, prevention or treatment of human diseases." 24 L.P.R.A. § 91a.

Pursuant to its rulemaking authority, the Secretary of Health promulgated requirements to establish and operate laboratories and blood banks in Puerto Rico. Secretary of Health Regulation No. 92–A ("Regulation 92–A") contains the requirements necessary to establish and operate laboratories and blood banks in Puerto Rico, and mirrors the provisions of Law 97. *Docket Document No. 25.*

Plaintiff avers that, since its activities are limited to the transportation of samples from Puerto Rico to its facilities in Texas, it is not within Law 97 and Regulation 92–A's regulatory ambit. Furthermore, it maintains that the statute's application would, therefore, constitute a

violation of the dormant commerce clause. As support, Plaintiff cites *National Pharmacies, Inc. v. De Melecio*, 51 F.Supp.2d 45 (D.P.R.1999) (hereinafter *"National Pharmacies (I)"*), and the First Circuit's opinion on appeal, *National Pharmacies, Inc. v. Feliciano–de–Melecio*, 221 F.3d 235 (1st Cir.2000) (hereinafter *"National Pharmacies (II)"*). Defendant fails to distinguish these cases from the case at bar, and with good reason. The captioned case is indistinguishable from *National Pharmacies*.

### 2. *National Pharmacies*

In *National Pharmacies (I)*, the named plaintiff (hereinafter "National"), an out-of-state pharmacy, entered into a contract with a Puerto Rico insurance company to provide prescriptions by mail to insureds. 51 F.Supp.2d at 49. National was licensed under the laws of New Jersey and employed New Jersey pharmacists. *Id.*

In 1994, the Secretary of Health of Puerto Rico sent letters stating her conclusion that the Pharmacy Act of Puerto Rico forbade mail-order pharmacy services. *Id.* at 50. The Secretary invited pharmacists and pharmacy owners to file complaints with the Department of Health and in the Puerto Rico courts. *Id.* National filed suit in the District Court of Puerto Rico seeking declaratory and injunctive relief. *Id.*

The district court issued a decision and declaratory judgment finding that the challenged provisions of the Pharmacy Act were not applicable to National's mail order pharmacy service. *Id.* at 45. The court began by addressing the specific sections of the state law challenged by National. The state law stated that a prescription for a Puerto Rico consumer "may only be filled by a pharmacist residing in the town where his pharmacy is located; that a pharmacy serving Puerto Rico must be managed by a pharmacist who must be present at the pharmacy for a specified number of hours per week; and that any pharmacy serving Puerto Rico consumers be licensed by the Secretary of Health and subject to inspections by the Secretary." *Id.* at 57. The court first noted that "federalism concerns ... are presented whenever a federal court is asked to judge the constitutionality of a state statute, and particularly when the federal court does not have the benefit of a state ruling on the particular aspect being challenged." *National Pharmacies (II)*, 221 F.3d at 240. The court then applied the analytical framework of *K–S Pharmacies v. American Home Products*, 962 F.2d 728 (7th Cir.1992), in which the Seventh Circuit narrowly construed a Wisconsin statute in order to avoid an unconstitutional reading. The district court concluded that:

[a] reading of these statutes to hold that the Puerto Rico Secretary of Health may inspect out-of-state pharmacies or that a pharmacist in another state must reside in the town where he is practicing or that an out-of-state pharmacist may only be absent from his pharmacy during the times set forth in section 402 would read these sections to be an unconstitutional attempt to regulate commerce outside the borders of Puerto Rico.

The court noted that the Puerto Rico Supreme Court had recognized that a state may exercise jurisdiction only over persons and things located within its territory. *Pueblo v. Contreras*, 95 J.T.S. 151, 402 n. 1, 1995 WL 943619 (1995); *Toro Ruiz v. Junta de Libertad Bajo Palabra*, 93 J.T.S. 120, 11033 n. 2, 1993 WL 854157 (1993); *Medina v. Tribunal Superior*, 104 P.R.Dec. 346, 348, 1975 WL 38701, 4 Official Translations 483, 486 (1975). The court concluded that the Puerto Rico Supreme Court would read certain provisions of the law, including those requiring in-

spections by the Secretary of Health, regulating the pharmacist's town of residence, and setting forth the hours when the pharmacist must be present at the pharmacy, to refer only to "establishments" or "pharmacies" in Puerto Rico. Consequently, the court held that those provisions were not applicable to the management and operation of National's business in New Jersey and could not be used to prevent National from servicing customers in Puerto Rico. Finally, the court noted that the Pharmacy Act was enacted in 1945, that the law had not been substantially changed since then, and that it "was evident from the language of the statutes that they were not enacted with mail-order pharmacies in mind: nowhere is there any mention of them." *Id.* at 59. Because the court held that the state law provisions did not apply to National, the court did not address National's argument that the provisions constituted an undue burden on interstate commerce.

On appeal, the First Circuit held that the district court properly construed the Puerto Rico Pharmacy Act. *National Pharmacies (II)*, 221 F.3d at 242. The court found that

> [a]lthough, as the court noted, the federal courts are somewhat more constrained in the use of "narrowing" constructions when interpreting state laws ... federal courts are nevertheless instructed to render interpretations of state law by using the same methods that the state court would use ... including the principle that statutes should ordinarily be given a constitutional interpretation where fairly possible. Furthermore, before determining how the Puerto Rico Supreme Court would most likely interpret the Pharmacy Act, the district court was careful to determine that the Supreme Court of Puerto Rico had itself recognized that a state's regulatory jurisdiction is generally limited to persons and things located within its

borders. Such care by the district court ensures that the federal court's reading of a state statute is as harmonious as possible with existing state law, and it thus protects the respectful balance mandated by our federal system. Under the circumstances, we think the district court approached its interpretative task appropriately.

*Id.*

The court also cited with approval the court's reliance on the Seventh Circuit's finding in *K–S Pharmacies,* inasmuch as the district court in that case was similarly faced with a state law of questionable constitutionality if interpreted broadly. The court found that "the court straightforwardly utilized a plain reading of the statute and standard interpretative canons to achieve a result that left the statute intact without violating the Commerce Clause." *Id.* The court stated that the provisions of the Pharmacy Act "made sense only when read to apply exclusively within Puerto Rico," particularly in light of the Pharmacy Act's passage prior to the advent of mail-order pharmacies. *Id.* at 242. Finally, the court specifically rejected the defendant's invitation to read the ommission of a prohibition on mail-order pharmacies as a prohibition, observing that "[n]otwithstanding the recognized authority of the states to regulate the professions and to regulate in areas of public health, the general rule is and must be that a particular activity is unregulated until the state takes some affirmative step to regulate it." *Id.*

█ Applying *National Pharmacies'* analytical template to the case at bar, we find that the laboratory statute here is similarly inapplicable to Plaintiff. Rather than belabor the point, we review the similarities here.

### 3. *Law 97*

"[F]ederal courts are ... instructed to render interpretations of state law by using the same methods that the state court would use, ... including the principle that statutes should ordinarily be given a constitutional interpretation where fairly possible." *National Pharmacies (II),* 221 F.3d at 241–42. The Puerto Rico Supreme Court has established that a court must interpret laws in ways which are compatible and congruent with maintaining the laws' constitutionality. *Nadal v. Departamento de Recursos Naturales,* 2000 T.S.P.R. 59, 66, 2000 WL 365431 (2000); *Banco Popular de Puerto Rico v. Municipio de Mayaguez,* 126 D.P.R. 653 (1990); *E.L.A. v. Aguayo,* 80 D.P.R. 554, 596 (1958). Thus, when the constitutionality of a law is questioned, the Supreme Court of Puerto Rico will not undertake a constitutional analysis when a statutory reading will suffice. *Nadal,* 2000 T.S.P.R. at 66, 2000 WL 365431. Furthermore, if a literal interpretation of the statute will create questions about its constitutionality, the court will temper the statute, if possible. *Id.* This interpretative framework, analogous to the one in *K–S Pharmacies* and *National Pharmacies,* disfavors a broad reading of a statute if such a reading would generate questions of constitutionality.

Law 97 limits itself to entities that establish or operate laboratories "in Puerto Rico." 24 L.P.R.A. 91, 91e (empowering the Puerto Rico Secretary of Health to direct such inspections and investigations as he may deem necessary of the clinical analysis laboratories "established and operated in Puerto Rico.") A plain reading of the clinical laboratory statute and its provisions suggest that it was meant to apply solely to Puerto Rico. The Puerto Rico laboratory license requirement demands that entities wishing to "establish or oper-ate a clinical lab in Puerto Rico ... have a license obtained from Puerto Rico," and states that only those labs with licenses are allowed to collect samples. 24 L.P.R.A. § 91. The statute provides that the "Secretary of Health is hereby empowered to direct such inspections and investigations as he may deem necessary of the clinical analysis laboratories ... established and operated in Puerto Rico," further requiring that the Secretary of Health "inspect the clinical analysis laboratories, plasmapheresis centers, seropheresis centers and blood banks to be established for the purpose of ascertaining whether or not they comply with the requirements of §§ 91–91i of this title and the regulations." By suggesting a physical presence of the actual testing facilities in Puerto Rico, the wording of the statute and its regulations imply that only laboratories established and operating in Puerto Rico are under the statute's purview.

Plaintiff's operations in Puerto Rico are limited to transporting samples collected and packed by the Department of Health. This is borne out by the contract between the Department of Health and Plaintiff CDD, which states that Plaintiff CDD is responsible for

> [g]athering samples in at least 13 designated localities of the Department of Health, provided, however, that from time to time the Department may designate additional localities. The [Department of Health] will be responsible for drawing the samples and placing them in appropriate specimen containers. The [CDD] will be responsible for all costs of picking-up, transportation and preserving such specimens.

*Docket Document No. 28.*

Accordingly, the drawing of samples was done by the Department of Health, while the Plaintiff's activities were limited to transporting the samples to its Texas facil-

ities. Defendant admitted that the Department of Health itself hired carriers to transport samples to contracted labs, and the these carriers were not considered to be within the clinical laboratory licensing statute's ambit. *Docket Document No. 18, Exh. 8.* Even if the statute were applicable to out-of-state laboratories such as Plaintiff's, Defendant does not articulate how Plaintiff has "established" or "operated" a clinical analysis laboratory in Puerto Rico. Given that Plaintiff's role in Puerto Rico is limited to a type of delivery service, we do not see how the licensing statute requirement, which regulates the establishment and operation of testing laboratories in Puerto Rico, would apply to Plaintiff CDD. Furthermore, while Defendant avers that Plaintiff has not attempted to apply for a license, it is not clear from the statute that Plaintiff would be required to do so given that it was not attempting to establish a laboratory with a physical presence in Puerto Rico.

In addition, we note that the statute here faces the same regulatory obstacle as the statute in *National Pharmacies (I)*. Law 97 provides that the "Secretary of Health is hereby empowered to direct such inspections and investigations as he may deem necessary of the clinical analysis laboratories ... established and operated in Puerto Rico," further requiring, *inter alia,* that the Secretary of Health "inspect the clinical analysis laboratories, plasmapheresis centers, seropheresis centers and blood banks to be established for the purpose of ascertaining whether or not they comply with the requirements of §§ 91–91i of this title and the regulations." 24 L.P.R.A. §§ 91,91b.

Further, the Secretary is empowered to create regulations

> [o]n the conditions to prevail in the maintenance and operation of the clinical analysis laboratories, the plasmapheresis centers, the seropheresis centers and the blood banks. Such regulations shall establish the requirements to be met by the personnel in charge of the clinical analysis laboratories, the plasmapheresis centers, the seropheresis centers and the blood banks, and the procedures to be followed in such laboratories, plasmapheresis centers, seropheresis centers and blood banks in the carrying out of the work, as well as records to be kept.

*Id.* at § 91d.

Consequently, the regulations here would also allow the Secretary to prescribe and regulate the operations of out-of-state laboratories. Such authority, as stated by the district court in *National Pharmacies (I)*, would contravene the holdings of the Supreme Court of Puerto Rico on the extent of Puerto Rico's jurisdictional and regulatory powers. *See National Pharmacies (I),* 51 F.Supp.2d at 59; *see also National Pharmacies (II),* 221 F.3d at 242. Notably, Defendant does not allege, let alone proffer evidence, suggesting that the Secretary of Health has promulgated regulations which would exclude out-of-state laboratories from the full scope of the Puerto Rico Secretary of Health's regulatory reach. Thus, a plain reading of the statute, coupled with the Puerto Rico Supreme Court's interpretation of the state's regulatory reach leads us to conclude that the statute, even if applicable to Plaintiff CDD's activities in Puerto Rico, is not meant to regulate or license out-of-state laboratories.

Further, Defendant does not submit, nor do we find, any laws or promulgated regulations which provide licensing procedures for out-of-state laboratories. While the statute has been amended since its ratification in 1962, these amendments have not changed the content of the laboratory act materially, but instead seemingly focusing on the type of testing performed. 24 L.P.R.A. § 91. Like the First Circuit in

*National Pharmacies*, we decline to find that an omission of regulation equals a prohibition. *National Pharmacies*, 221 F.3d at 242–243 (finding that "the general rule is and must be that a particular activity is unregulated until the state takes some affirmative step to regulate it").

Finally, Plaintiff CDD complies with the CLIA guidelines. We observe that Puerto Rico Department of Health's licensing regulations were specifically modified to require compliance with the provisions of the CLIA. *Docket Document No. 18.* Even though Defendant has not fully developed arguments as to any undue risks resulting from an absence of a license here, Plaintiff CDD's compliance with the federal CLIA requirements intimates that any risk would be attenuated.

Thus, Law 97 and Regulation 92–A, "make sense only when read to apply exclusively to Puerto Rico." *National Pharmacies*, 221 F.3d at 242. As such, we find that the licensing requirement here does not apply to Plaintiff CDD.

## IV.

### *Conclusion*

In accordance with the foregoing, we **DENY** Defendant's cross-motion for summary judgment premised on lack of jurisdiction. *Docket Document No. 25.* We also find that the clinical laboratory licensing requirement, 24 L.P.R.A. 91, is inapplicable to Plaintiff CDD. We, therefore, **DENY WITHOUT PREJUDICE** Plaintiff CDD's challenge to the constitutionality of the statutes mentioned, *supra. Docket Document No. 18.* Declaratory judgment shall be entered holding that the provisions of 24 L.P.R.A. § 91 are applicable only in Puerto Rico.

**IT IS SO ORDERED.**